[No. 5396.   Decided February 18, 1905.]

THE STATE OF WASHINGTON, *Respondent,* v. EDWIN J.
BROWN, *Appellant.*[1]

CONSTITUTIONAL LAW—DENTISTS—LICENSE FOR OWNERSHIP OF
DENTAL OFFICE. That portion of Laws, 1891, p. 314, requiring one
to submit to an examination and secure a license from the state
dental board, in order to "own, run or manage" a dental office,
as distinguished from the practice of dentistry, is unconstitu-
tional.

SAME—POLICE POWER. Restricting the right to own, run, or
manage a dental office is not a proper exercise of the police power,
since technical knowledge or skill is not essential to the proper
exercise of such right and is not required for the well being of
the public, and the acts in question do not injuriously affect the
health, good order, or safety of society.

SAME—RIGHT OF PROPERTY AND LIBERTY. Restricting the right
to own, run, or manage a dental office is an unwarranted abridg-
ment of the private right of property and of the citizen's liberty
to engage in legitimate pursuits for a livelihood

APPEAL AND ERROR—BRIEFS. A motion to strike a brief on the
ground of an incorrect statement of the case and want of refer-
ences to the record will be denied where the record is short and
reference thereto not essential to the decision.

Appeal from a judgment of the superior court for King
county, Kennan, J., entered June 24, 1904, upon a trial
and conviction of the offense of owning and running a
dental office without a license.    Reversed.

*John R. Parker,* for appellant.

*Samuel R. Stern,* for respondent.

ROOT, J.—Appellant was prosecuted upon an informa-
tion charging him with "the crime of owning, running
and managing a dental office or department in the state
of Washington, without a license," in violation of an act

[1]Reported in 79 Pac. 635.

of the legislature approved March 18, 1901, commonly known as the "dental law," and found at pages 314 to 318, of the published session laws of 1901.    The portions of said act involved in this case are as follows:

"§ 4.    Any person or persons seeking to practise dentistry in the state of Washington, or to own, operate or cause to be operated, or to run or manage a dental office or place for the practise of dentistry in the state of Washington after the passage of this act shall file his or her name, together with an application for examination, with the secretary of the state board of dental examiners, and at the time of making such application shall pay to the secretary of the board a fee of twenty-five dollars, and to present him or herself at the first regular meeting thereafter of said board to undergo examination before that body.    No person shall be eligible for such an examination unless he or she shall be of good moral character and shall present to said board his or her diploma from some dental college in good standing and shall give satisfactory evidence of his or her rightful possession of the same:    .  .  .

"§ 8.    Any person who, as principal, agent, employer, employee, or assistant, who in any manner whatsoever shall practise dentistry or who shall own, run, operate or cause to be operated, or manage a dental office or headquarters in the state of Washington without having first filed for record and had recorded in the office of the auditor of the county wherein he shall so practise or do such act, a certificate from said board of dental examiners as herein provided, shall be deemed guilty of a misdemeanor, .  .  .

"§ 11.    All persons shall be said to be practising dentistry within the meaning of this act who shall contrary to this act for a fee or salary or other reward paid either to himself or to another person for operations or parts of operations of any kind, treat diseases or lesions of the human teeth or of jaws or correct malpositions thereof, or who shall own, run, or manage a dental office or department in the state of Washington, without registering and procuring the license as herein provided."

From a judgment of conviction, he appeals to this court.

Appellant contends that this statute is unconstitutional, and especially that portion requiring a license from the state board of dental examiners as a prerequisite to "owning, running, or managing" a dental office or department. The validity of this statute, in so far as it requires a license from said board before one may "treat diseases or lesions of the human teeth or of jaws or correct malpositions thereof," has been heretofore upheld by this court. *State ex rel. Smith v. Board of Dental Examiners,* 31 Wash. 492, 72 Pac. 110. *In re Thompson,* 36 Wash. 377, 78 Pac. 899. These decisions sustain the statutory requirements for the "practice of dentistry," as that expression is commonly understood, and as it is mentioned in section 4 of the act above quoted, where the disjunctive "or" shows it to be clearly distinguished from the expression "to own, operate or cause to be operated, or to run or manage a dental office or place for the practice of dentistry," which follows.

The question is now presented as to the power of the legislature to enact a law requiring an examination by, and license from, the state dental board, as a prerequisite to "owning, running and managing a dental office or department." Appellant contends that this is an unwarrantable infringement of a natural and constitutional right. Respondent maintains that it is justifiable as a legitimate exercise of the police power of the state. It will be conceded, we apprehend, that the portion of the law in question cannot be sustained, unless by virtue of the police power. This requires a consideration of the purpose, nature and extent of that power. Courts and text-book writers have found it difficult to accurately define this power, and we find their conceptions of it expressed in varied forms. This court, in the case of *State v. Carey,* 4 Wash. 424, 30 Pac. 728, speaking through Dunbar, J., quotes approvingly from the case of *Lake View v. Rose*

*Hill Cemetery*, 70 Ill. 192, 22 Am. Rep. 71, where the court referred to this subject as "that inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort, safety, and welfare of society." Speaking of it in the *Slaughter-House Cases*, 16 Wall. 36, 21 L. Ed. 394, Mr. Justice Field, at page 87, said:

"That power undoubtedly extends to all regulations affecting the health, good order, morals, peace, and safety of society.   .   .   .   But under the pretense of prescribing a police regulation the state cannot be permitted to encroach upon any of the just rights of the citizen, which the constitution intended to secure against abridgment."

In *Railroad Co. v. Husen*, 95 U. S. 465, 24 L. Ed. 527, the supreme court of the United States, speaking through Mr. Justice Strong, said:   "The state may protect the lives, limbs, health, comfort and quiet of all persons and their property."   From these and the many adjudicated cases touching the subject, the proposition is deducible that the police power may curtail the rights of the individual in so far as, and no farther than, the free exercise thereof is calculated to infringe upon the rights of others.   Ordinarily a natural and constitutional personal right or privilege may be limited only when its free exercise threatens or endangers the moral or physical well-being of others, or their property; and rights and privileges concerning property may be circumscribed under like circumstances, or when the public, or some portion thereof, has an interest or is concerned in the use thereof.   The police power does not justify the withholding from one individual of a natural privilege or right, in order that a corresponding advantage may be added to the rights or privileges of another.   The restriction is permissible only as a preventive of evil results reasonably to be expected without such limitation.   Russell on Police Power, pp. 34, 35, says:

"To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

The foregoing quotation is the language of the supreme court of the United States in *Lawton v. Steele,* 152 U. S. 137, 14 Sup. Ct. 499, 38 L. Ed. 385. See, also, *Yick Wo v. Hopkins,* 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220. Our constitutions, both federal and state, are jealous of the rights of the individual, and will permit of their abridgment only where the same is essential to the well-being and rights of others. In the case of *State ex rel. Smith v. Board of Dental Examiners, supra,* this court, speaking through Hadley, J., said:

"It is of the highest importance to the state that suffering and afflicted humanity shall not be subjected to the care and treatment of unlearned and unskilled persons. In its effort to prevent such a misfortune to its people, the state may adopt a standard for the test of fitness to engage in the work of what should be a learned profession."

The reasoning and conclusion thus set forth, applied as they were to the "practice of dentistry," as commonly understood, are incontrovertible. But are the reasons therein assigned applicable to a statute requiring an examination by, and license from, a dental board before one may "own, run, or manage" a dental office? Does the police power authorize the enactment of a statute making this requirement? We feel constrained to hold that it does not. It is solicitude for the physical well-being of the public, or that portion that may need dentistry work, which justifies that part of the statute providing for the examination and licensing of those who desire to "treat diseases or lesions of

the human teeth or of jaws or correct malpositions thereof." To perform such work with safety and proper regard for health and comfort, the operator must possess technical knowledge and skill peculiar to the study and practice of dentistry. Can the same be said of one desiring to "own, run, or manage" a dental office? We think not.

To own and manage property is a natural right, and one which may be restricted only for reasons of public policy, clearly discernible. To hold this portion of the statute valid would be to make possible conditions which were never designed to exist. To illustrate, suppose a man thoroughly qualified and legally licensed as a dentist should die, leaving a perfectly and completely equipped dental office to his widow, who knew nothing of dentistry and was incapable of securing a license. By continuing to "own" this property any appreciable time she would become liable to prosecution, under this part of the statute. Can the police or any other power be constitutionally invoked to produce such a result? We are led to believe not. Let us carry the illustration a little further. The widow, not being able to sell the dental office to advantage, decides to hire competent and legally licensed dentists to treat patrons of the office, and undertakes the management herself, paying bills, collecting accounts, arranging credits, making appointments, and doing other acts necessary to the supervision and control of the business affairs of the concern. Then she becomes a criminal, if this portion of the statute have virtue, because she has "managed a dental office." And yet, it will scarcely be contended that any of these acts injuriously affect "the health, good order, morals, peace, or safety" of society, or menace "the lives, limbs, health, comfort, quiet or property" of the patients treated in such office. Many similar illustrations will readily oc-

cur to the mind given to the contemplation of the natural
results reasonably to be anticipated under the operation of
such a statute.

A consideration of the province of the police power, in
the light of constitutional rights, would seem to show, be-
yond controversy, that in the enactment of this portion of
the statute the legislature transcended its authority. Should
the owner or manager hire operators not legally qualified,
or should they participate in the treatment or operations
mentioned in the other portion of the statute, they would,
of course, be amenable to and punishable under those pro-
visions. But we are unable to say or perceive that the
health, moral or physical welfare of the public, or any of
the personal or property rights of its individuals, are en-
dangered by the ownership and management of a dental
office, so long as those employed therein to do the actual
dentistry work are qualified and licensed as by law re-
quired.

In the case of *In re Aubrey,* 36 Wash. 308, 78 Pac. 900,
this court held unconstitutional an act of the legislature
requiring horseshoers to pass an examination. In the
opinion the following language occurs:

" 'Liberty,' in its broad sense, as understood in this coun-
try, means the right not only of freedom from actual servi-
tude, imprisonment, or restraint, but the right of one to
use his faculties in all lawful ways, to live and work when
he will, to earn his livelihood in any lawful calling, and to
pursue any lawful trade or avocation."

And the court quotes from the case of *Allgeyer v. Louis-
iana,* 165 U. S. 589, 17 Sup. Ct. 427, 41 L. Ed. 832,
where the supreme court of the United States employed
similar language in a like holding. In *People ex rel.
Tyroler v. Warden of Prison,* 157 N. Y. 116, 51 N. E.
1006, 43 L. R. A. 264, 68 Am. St. 763, the court of
appeals of New York held unconstitutional a statute pro-

hibiting a person from selling railroad tickets unless employed by a transportation company. In the opinion Mr. Justice Parker said:

"It is novel legislation, indeed, that attempts to take away from all the people the right to conduct a given business, because there are wrongdoers in it,  . . ."

It was held that the legislature has not the power to interdict the sale of a valid ticket by one person to another upon the pretext that fraud will thus be prevented.

Judge Brannon, in his book, "The Fourteenth Amendment," at page 200, says:

"While guarding the public right and welfare, we must not forget the person's right; we must not submerge the right of the individual in the ocean of public right.  . . . All men are free by nature. They have certain inalienable rights, says the Declaration of Independence. When they enter into the body politic they do not give up these rights.  . . . They have right of life, right of property, and, with the aid of property as a handmaid, to earn a livelihood in their own ways, not harming others. They have right to labor, right to contract, right to do business. These are rights of liberty inhering and sheltered by the word 'liberty,' expressed in the constitution. Legislation for the high public behest of public safety and welfare can justly detract from those rights, but not otherwise. No call but a necessary public want can do so."

See, also, *Bessette v. People,* 193 Ill. 334, 62 N. E. 215, 56 L. R. A. 558; Tiedeman, State & Federal Control, p. 13 *et seq.,* and 482; Tiedeman, Lim. Police Power, p. 194 *et seq.,* and 277-281; Cooley, Torts, p. 277; *People v. Caldwell,* 168 N. Y. 671, 61 N. E. 1132; *In re Sing Lee,* 96 Cal. 354, 31 Pac. 245, 24 L. R. A. 195, 31 Am. St. 218; *Noel v. People,* 187 Ill. 587, 58 N. E. 616, 52 L. R. A. 287, 79 Am. St. 238; Black, Constitutional Law (2d ed.), 471 *et seq.*

Congress has enacted statutes requiring masters, mates, and engineers of various vessels to pass examinations and

procure licenses before engaging in the work of their respective avocations. But we are unaware of any such prerequisite for one seeking to own a ship or manage its business. Druggists who compound medicines must have a license, but this is not essential to ownership of a drug store. The owner complies with the statute when he hires a duly licensed pharmacist to attend to the matters requiring a knowledge of drugs, medicines, and poisons. Had the "ownership" of ships or drug stores been deemed a menace to the health, safety, or welfare of those patronizing either, examinations and licenses would doubtless have been provided for. But the necessity for such requirements evidently never occurred either to Congress or the legislature. Yet the reasonableness and legality of such prerequisites could be more readily upheld than those involved in the case at bar. Mr. Tiedeman, in Limitations of Police Power, p. 277, says: "But it is a judicial question, whether the particular occupation or trade can, under the constitutional limitations, be restrained." See, also, *State v. Namias,* 49 La. Ann. 618, 21 South. 852, 62 Am. St. 657; 22 Am. & Eng. Ency. Law (2d ed.), 931 *et seq.; In re Jacobs,* 98 N. Y. 98, 50 Am. Rep. 636.

We feel that a court should be reluctant to pronounce a statute invalid, except where its plain duty impels such action. Conceiving this to be such a case, we are led to declare that part of the statute requiring an examination and license in order to "own, run, or manage" a dental office or department void.

Appellant contends that the information is insufficient, and alleges numerous errors as to rulings upon the reception, exclusion, and sufficiency of evidence. These matters become immaterial in view of our conclusion as to the validity of the statute.

Respondent moves to strike appellant's brief upon the

ground that it does not contain a correct statement of the case, and does not contain references to the transcript. The brief contains some references, but should have more. However, the record and transcript are short, and our view of the law has rendered it unnecessary to make an extended examination of them. The motion will be denied. *Froelich v. Morse,* 15 Wash. 636, 47 Pac. 22.

The judgment of the honorable superior court is reversed, and the case remanded, with instructions to dismiss the action.

MOUNT, C. J., RUDKIN, DUNBAR, and CROW, JJ., concur.

HADLEY and FULLERTON, JJ., took no part.