STATE of Minnesota, Respondent,

v.

Melvin HANSON and Gordon
Hanson, Appellants.

No. C5–83–171.

Supreme Court of Minnesota.

March 15, 1985.

Marc G. Kurzman, Minneapolis, for appellants.

Norm Coleman, Sp. Asst. Atty. Gen., St. Paul, John R. Krouss, County Atty., Baudette, Martin Berg, Roseau, for respondent.

SCOTT, Justice.

The stop of Melvin and Gordon Hanson in Lake of the Woods County late on July 24, 1982, led to the discovery of marijuana in their possession and led to the consensual search of, and discovery of more marijuana in, their respective residences in nearby Roseau County early on the 25th. Gordon was charged in Lake of the Woods County with the petty misdemeanor offense of possessing a small amount of mar-

ijuana, and Melvin was charged there with the misdemeanor offense of possessing more than .05 ounces of marijuana in the passenger compartment of his own motor vehicle. The county attorney in Roseau County charged Gordon with felonious possession of marijuana for the marijuana discovered on his property. Defendants failed to have the marijuana suppressed on Fourth Amendment grounds and to have the prosecutions dismissed on the ground that the statutory classification scheme listing marijuana as a Schedule I controlled substance is unconstitutional. Using the procedure approved in *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980), Melvin and Gordon both stipulated to the evidence against them and were found guilty of the charges.[1] Gordon appealed the Roseau County felony conviction directly to this court. We permitted Gordon and Melvin to appeal the decision of the district court affirming their convictions in Lake of the Woods County. Issues on the consolidated appeals are (1) whether the respective courts erred in denying the suppression motions and (2) whether they erred in their rulings on the constitutionality of classifying marijuana as a Schedule I controlled substance. We affirm.

At 11:55 p.m. on July 24, 1982, Deputies Robert Paulseth and Dallas Block of the Lake of the Woods County Sheriff's Office came upon Melvin Hanson's vehicle, which was stopped hazardously in the west bound traffic lane of Trunk Highway 11, a two-lane heavily-traveled highway with shoulders. After becoming aware of the officers' presence, Melvin accelerated slowly to 20 to 30 miles per hour in what was a 55 mile per hour zone and drove erratically, weaving within his lane and crossing over the center line at one point. The officers stopped the car and approached, Paulseth on the driver's side, Block on the passenger's side. Although he smelled no odor of alcohol, Paulseth began to suspect that

1. For the felony, Gordon was sentenced to a prison term of 1 year and 1 day with execution stayed on condition that he serve 60 days in jail. The district court stayed the jail term pending this appeal. It is not clear if the defendants were sentenced for the misdemeanor and petty misdemeanor convictions; there is an order in the file on appeal stating that they are to remain free in connection with the offenses pending this appeal.

Melvin, whose speech seemed confused, was under the influence of something. Block, meanwhile, saw an open beer can on the floor and a hand-rolled cigarette surrounded by leafy material and placed in an open book that was on the seat between the two men. Block opened the door, reached in and picked up the can, asked Gordon to get out, and then seized the cigarette. The can was empty but the cigarette smelled of marijuana. Block saw a bulge in Gordon's pants and therefore asked him to unsnap his pants. Gordon reached in and got a small bag of marijuana, which he handed to Block. Block placed Gordon in the squad car and "probably" told him that he was under arrest. Paulseth asked Melvin to get out and stand in front of the squad car, then he entered Melvin's car and searched it, finding a plastic margarine or butter container with more marijuana in it. In the glove compartment he found another marijuana cigarette. In a pat-down search that included asking Melvin to unsnap his pants, Block found a roach clip and a vial containing marijuana cigarette butts. Melvin said that they were Gordon's. Melvin, who was placed under arrest by Block, consented to the officers' looking in the trunk, where a small amount of green leafy material, similar to that found elsewhere in the car, was found. Paulseth and Block discussed seizing the car because it had been used in transporting marijuana, but decided instead to simply park it at a nearby residence for the evening because the men were not in a condition to drive it. Paulseth told Melvin they were not going to let him drive it any more that night, that they would give him a ride home. Since the marijuana seemed to him to be homegrown, Paulseth asked Melvin if he would show them his homegrown marijuana and Melvin said yes.

At 12:30 a.m. Paulseth and Block called Chief Deputy Patrick Novacek and Deputy Duane Solie, both of Roseau County, and asked them to meet them in Roosevelt, which is on the border of the two counties. On the way to Roosevelt, Gordon talked about the medicinal value of marijuana.

There was no discussion with Gordon about whether he had marijuana at his place.

At Roosevelt, Paulseth and Block told Novacek and Solie that Melvin had agreed to let the Roseau County officers go to his residence and pull up the marijuana growing there. Melvin then got in the Roseau County squad car and drove with Novacek and Solie; Paulseth and Block, accompanied by Gordon, followed in their car. Melvin showed Novacek and Solie several locations where there were growing marijuana plants and also showed them dried marijuana residues in his house. The officers seized approximately 1 pound of marijuana. Asked if Gordon had any at his place, Melvin said that they would have to ask Gordon.

When Paulseth and Block received a call requiring them to leave, they transferred Gordon to the squad car of Novacek and Solie. Solie told Gordon, who had publicly advocated legalizing marijuana for medical use and who also apparently had publicly stated that he had used marijuana for its medicinal value, that he did not think it was right that he was letting Melvin take the rap. Gordon did not respond to this. After telling Melvin that they would be contacting the county attorney and that the county attorney would notify him of any charges, Novacek and Solie left Melvin and drove off with Gordon, saying that they were taking him home. As they started driving, Solie gave Gordon a *Miranda* warning. Gordon, who said he understood, then asked, "What's going to happen if I give you my marijuana?" Solie told him they would present the matter to the county attorney. Gordon then agreed to show the officers his marijuana. In the outbuildings he showed them two marijuana plants hanging from the rafters, gave them a box with more marijuana leaves in it, and reluctantly gave them another box with some more marijuana in it. The officers seized between 12 and 13 ounces. Asking the officers how he was going to get through the winter without his supply of marijuana, Gordon tried to persuade the officers to leave him some. They refused. Gordon was not taken into custody.

1. Defendants do not challenge the legality of the stop or of the discovery of the marijuana cigarette. They contend, however, that there was no justification for the further frisk of their persons or for the search of the car. They argue also that any consent given by them for the searches of their respective houses was involuntary and invalid.

■ The frisk of their persons and the further search of the car were both clearly justified. It is true that possession of a single marijuana cigarette is a petty misdemeanor, which ordinarily does not justify a custodial arrest. Minn.R.Crim.P. 6.01, subd. 1(1)(a); *State v. Martin*, 253 N.W.2d 404 (Minn.1977). However, the fact that police officers apparently do not have grounds to custodially arrest a defendant does not mean that the officers do not have grounds to conduct a search. Minn.R. Crim.P. 6.01, subd. 4, provides that "The issuance of a citation does not affect a law enforcement officer's authority to conduct an otherwise lawful search." Block justifiably ordered Gordon out so that he could reach in and seize the cigarette, which was obviously a marijuana cigarette. The discovery of the cigarette clearly justified the further search of the car, including the trunk, even apart from any consent by Melvin. *State v. Schinzing*, 342 N.W.2d 105 (Minn.1983) (discovery of "stone" and marijuana cigarette butt in car justified probable cause warrantless search of car, including trunk, for more marijuana pursuant to motor vehicle exception to warrant requirement). The search of Gordon's person is supported by *State v. Ludtke*, 306 N.W.2d 111 (Minn.1981) (upholding frisk of two motorists on highway after finding small amount of marijuana on them, there being an objective basis for a protective weapons frisk; avoiding issue whether officers had probable cause to believe they would find more drugs). The basis for the frisk of Gordon is arguably even stronger than the basis for the frisk in *Ludtke*, since Gordon had an obviously unusual bulge in his pants. The frisk of Melvin was additionally justified by the discovery of marijuana under the driver's seat.

■ Paulseth and Block obtained consent from Melvin to search his residence for more marijuana. We need not decide whether that consent was valid. Gordon has no right to complain about any violation of Melvin's rights and Melvin has no cause to complain, since he was not prosecuted for the marijuana discovered in the search of his residence.

■ The best argument that can be made on Gordon's behalf is the argument that the officers arrested him illegally, rather than giving him a citation, and that the consent was the fruit of that illegality. It is true that Block apparently told Gordon that he was under arrest. The officers, however, had no intent to *custodially* arrest Gordon. Rather, they intended to take him and Melvin to their respective houses. They drove to Roosevelt, where they met the Roseau County officers, then drove to Melvin's house, where they sat with Gordon while the Roseau County deputies conducted the consensual search. Then, after the Roseau deputies seized Melvin's marijuana, they took custody of Gordon and told him they were driving him home. As the Roseau deputies were driving him home they gave him a *Miranda* warning and Gordon then agreed to let them search his residence.

If it could be said that Gordon gave his consent while he was being illegally detained, then the case for holding that the consent was tainted and invalid would be greater. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). However, by the time Gordon gave his consent, he was on his way home and knew it. Similarly, if it could be said that Gordon gave his consent in the course of an illegal search of his property, then the case for holding that the consent was tainted and invalid would be strong. *State v. Hoven*, 269 N.W.2d 849 (Minn.1978). However, the police had searched only Melvin's residence, not Gordon's residence, and therefore this factor does not apply. Indeed, Gordon was told that he was being taken home and he was given a *Miranda*

warning that stated, among other things, that he was under no obligation to talk with the officers. Notwithstanding these facts, Gordon consented to the search of his house. Under the circumstances, we conclude that his consent was valid and untainted by any arguable prior illegality.[2]

2. Defendants' other contention is that classifying marijuana as a Schedule I controlled substance is unconstitutional. We rejected such a contention in *State v. Vail*, 274 N.W.2d 127 (Minn.1979). Defendant argues that the medical profession now recognizes that marijuana has medicinal value and that therefore classifying marijuana as a Schedule I substance is unconstitutional. This argument was advanced in the previous case of *United States v. Fogarty*, 692 F.2d 542 (8th Cir. 1982), *cert. denied*, 460 U.S. 1040, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983), which is substantially in point. The opinion in *Fogarty* addressed the issue as follows:

Fogarty also contends that his conviction should be reversed because of the alleged unconstitutionality of the Federal Controlled Substances Act. 21 U.S.C. §§ 801–904 (1976) (CSA or Act). Specifically, Fogarty claims that the classification of marijuana as a Schedule I controlled substance, *id.* at § 812(b), Schedule I(c)(10), is irrational and arbitrary, violating the due process and equal protection mandates of the Fifth Amendment to the United States Constitution. The gist of this claim is that the weight of current medical knowledge purportedly shows that marijuana does not satisfy the three statutory criteria necessary for inclusion in Schedule I—(A) high potential for abuse, (B) no currently accepted medical use, and (C) lack of accepted safety for use of the drug under medical supervision. 21 U.S.C. § 812(b)(1). Fogarty places particular emphasis on the number of currently accepted medical uses for marijuana, including therapeutic uses in the treatment of glaucoma and cancer.

In addressing this argument, we first note the highly deferential standard of review applicable here. Because there is no fundamental constitutional right to import, sell, or possess marijuana, the legislative classification complained of here must be upheld unless it bears no rational relationship to a legitimate government purpose. *United States v. Kiffer*, 477 F.2d 349, 352 (2nd Cir.1972), cert. denied, 414 U.S. 831, 94 S.Ct. 165, 38 L.Ed.2d 65 (1973). Accordingly, "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines ...." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). Furthermore, judicial self-restraint is especially appropriate where as here the challenged classification entails legislative judgments on a whole host of controversial medical, scientific, and social issues. *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 706, 38 L.Ed.2d 618 (1974); also see Kiffer, 477 F.2d at 352. As noted in *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955): "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

With this in mind, we conclude that Fogarty has not met his heavy burden of proving the irrationality of the Schedule I classification of marijuana. First, the ongoing vigorous dispute as to the physical and psychological effects of marijuana, its potential for abuse, and whether it has any medical value, supports the rationality of the continued Schedule I classification. *See National Organization for Reform of Marijuana Laws v. Bell*, 488 F.Supp. 123, 128–30, 136, 139–40 (D.D.C.1980) (Three Judge Court) for Judge Tamm's excellent discussion of the current state of medical and scientific

---

**2.** Because of our holding, we need not consider whether there are any alternative approaches that would justify the conclusion that suppression was not required.

knowledge concerning the uses and effects of marijuana. Furthermore, the three statutory criteria for Schedule I classification set out in § 812(b)(1)—high potential for abuse, no medically accepted use, and no safe use even under medical supervision—should not be read as being either cumulative or exclusive. Thus, even assuming, arguendo, that marijuana has some currently accepted medical uses, the Schedule I classification may nevertheless be rational in view of countervailing factors such as the current pattern, scope, and significance of marijuana abuse and the risk it poses to public health. See 21 U.S.C. § 811(c)(1)–(8). Finally, it should be noted that under Section 811 Congress has provided a comprehensive reclassification scheme, authorizing the Attorney General to reclassify marijuana in view of new scientific evidence. In establishing this scheme, Congress provided an efficient and flexible means of assuring the continued rationality of the classification of controlled substances, such as marijuana. See, *Kiffer*, 477 F.2d at 357.

692 F.2d at 547–8. (Footnote omitted). To the same effect, *see State v. Ennis*, 334 N.W.2d 827 (N.D.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983), wherein the court stated, among other things, "[W]e do not believe that the questions of whether or not marijuana 'has no accepted medical use ... or lacks accepted safety for the use in treatment' can be resolved by the simple fact that some states may now be experimenting with the use of marijuana as a prescriptive drug under very limited circumstances." 334 N.W.2d at 834. And *see State v. Whitney*, 96 Wash.2d 578, 583, 637 P.2d 956, 960 (1981), holding that the limited placement of marijuana in Schedule II for a research program and "the retention of the drug in Schedule I for purposes other than the research program cannot reasonably be said to bear no rational relation to a legitimate legislative purpose." We continue to believe that the legislative classification of marijuana in Schedule I does not violate the constitution.

Affirmed.