940 P.2d 604 (1997)
132 Wash.2d 776
Ralph SEELEY, Respondent,
v.
STATE of Washington, Appellant.
No. 63534-0.
Supreme Court of Washington, En Banc.
Argued September 25, 1996.
Decided July 24, 1997.
*606 Christine Gregoire, Attorney General, Melissa Cain, Assistant Attorney General, Olympia, for Appellant.
Ralph Seeley, Tacoma, for Respondent.
Kevin Hamilton, Erika J. Starrs, Stephen C. Willey, Seattle, Jeffrey T. Haley, Bellevue, Davis, Wright & Tremaine, Bruce Johnson, Gregory Kopta, Kraig Baker, Steinborn & Associates, Jeffrey Steinborn, Seattle, Michael Cutler, Boston, MA, for Amicus Curiae.
*605 MADSEN, Justice.
The State appeals a decision of the Pierce County Superior Court holding that RCW 69.50.204(c)(14), which places marijuana in Schedule I of controlled substances, is unconstitutional, violating art. I, §§ 12, and 32 of the Washington Constitution. This court concludes that RCW 69.50.204(c)(14) does not violate the Washington Constitution and reverses the trial court.

STATEMENT OF THE CASE
The Respondent, Mr. Seeley, was diagnosed with chordoma, a rare form of bone cancer, in 1986. Mr. Seeley has undergone numerous surgeries including the removal of his right lung and a removal of part of the lower lobe of his left lung. Mr. Seeley also suffers from "severe Obstructive Airway Disease." *607 Clerk's Papers (CP) at 267. Mr. Seeley's condition is diagnosed as terminal.
Throughout his battle with cancer, Mr. Seeley has received radiation therapy and chemotherapy. Mr. Seeley was treated with various chemotherapeutic agents which commonly produce nausea and vomiting. He was treated with synthetic tetrahydrocannabinal (THC) (Marinol or dronabinol) and other antiemetic drugs for the nausea and vomiting which resulted from the chemotherapy. Mr. Seeley has also smoked marijuana during chemotherapy. Mr. Seeley prefers smoking marijuana to control these side effects. Mr. Seeley states that smoking marijuana has been more effective in relieving his symptoms than other antiemetics.
Marijuana is a hallucinogen derived from the Indian hemp plant. One of the principle active ingredients in marijuana is delta-9-tetrahydrocannabinal (THC). The amount of THC present in marijuana varies in the plant depending on the origin of the plant, growing conditions, and cultivation. In addition to THC, marijuana contains over 400 other chemical substances including 61 identified cannabinoids, the active ingredients in marijuana, including THC. In 1986, the pure synthetic form of THC (Marinol or dronabinol) was approved by the federal Food and Drug Administration (FDA) and is used as an antiemetic. The FDA has not approved marijuana for medical treatment.
Marijuana is regulated by both the state and federal government. Washington adopted the Uniform Controlled Substances Act, RCW 69.50, in 1971. The Uniform Controlled Substances Act parallels the federal Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 (1996 Supp.). These laws establish a comprehensive statutory mechanism to control the manufacture, distribution, and use of controlled substances. Penalties are imposed for violations of the law. Both statutes place controlled substances in numerical schedules I to V and create an administrative mechanism to change the placement of substances on the various schedules. Substances on schedule I are illegal under all circumstances except for research. Substances on schedules II to V are legal to possess only under a valid prescription. Federal and state laws impose tandem registration requirements on practitioners, pharmacists and manufacturers of controlled substances.
Both federal and state statutes list marijuana in schedule I of controlled substances. See RCW 69.50.204(c)(14); 21 C.F.R. § 1308.11(d)(19) (1996). Thus, it is illegal for use under all circumstances except under narrow exceptions for research. Controlled substances listed in schedule I under federal law may not be prescribed or dispensed anywhere in the United States unless a specific registration to do so is obtained to use the substance for research purposes. See 21 U.S.C. §§ 822-23, 872 (1981). Marijuana cannot be legally prescribed, nor can a prescription for marijuana be filled by a pharmacist in Washington unless a federal registration is granted.
The State of Washington obtained federal approval to use marijuana for research purposes and the Legislature passed the Controlled Substances Therapeutic Research Act (Research Act) in 1979. RCW 69.51. The Research Act was enacted to determine if the principle ingredient in marijuana, THC, was effective in the treatment of nausea and vomiting caused by radiation and chemotherapy. RCW 69.51.020; see also CP at 41. Although still law, the Legislature stopped funding the program in 1980. The reason given for the discontinuation of funding was because the results were favorable and THC was synthesized, approved by the FDA, and marketed as Marinol. Thus, the Legislature determined that state funding was no longer necessary.
However, in 1996, the Washington Legislature restored funding to the board of pharmacy to study the effects of medicinal marijuana.[1] The study is to be performed in connection with a Washington State University research project which will research a tamper-free means of cultivating effective and safe marijuana plants for medicinal purposes. *608 1996 Legislative Budget Notes, Supplemental Budget, § 217, at 114 n. 8, § 605, at 169 n. 8.[2]
Similar to the federal statute, Washington's Uniform Controlled Substances Act classifies controlled substances based on their therapeutic value, potential for abuse, and safety. A substance is listed in schedule I if it has (1) a high potential for abuse, (2) no currently accepted medical use in treatment in the United States, and (3) no accepted safety for use in treatment under medical supervision. RCW 69.50.201. A substance is placed in schedule II upon finding that: (1) the substance has a high potential for abuse, (2) the substance has currently accepted medical use in treatment or currently accepted medical use with severe restrictions, and (3) the abuse of the substance may lead to severe psychic or physical dependence. RCW 69.50.205.
In Washington, the Legislature made the initial scheduling placements when it adopted the Uniform Controlled Substances Act in 1971, including the placement of marijuana on schedule I. In 1986, the Legislature placed Marinol, the FDA approved form of synthetic THC, on schedule II.[3] Laws of 1986, ch. 124 § 3 (codified at RCW 69.50.206(f)(1)). The Legislature kept marijuana on schedule I. All other forms of tetrahydrocannabinols are listed in schedule I. RCW 69.50.204(c)(22).
The Uniform Controlled Substances Act specifically permits the board of pharmacy to schedule or reschedule controlled substances based on specific criteria. RCW 69.50.201.[4] The board of pharmacy, pursuant to its authority, has maintained marijuana in schedule I.[5] Mr. Seeley has not asked the board of pharmacy to initiate the state administrative process described in RCW 69.50.201 for rescheduling marijuana and the board has not independently initiated that administrative process.
The Respondent, Ralph Seeley, filed this pro se lawsuit against the State of Washington in the Superior Court for Pierce County. Mr. Seeley asked the Superior Court for a declaratory judgment finding RCW 69.50.204(c)(14), which places marijuana on schedule I of controlled substances, unconstitutional under art. I, §§ 12, 32 of the Constitution of the State of Washington. Additionally, Mr. Seeley asked the court for an order directing the board of pharmacy to reclassify marijuana so that it may be prescribed by physicians for the plaintiff and other citizens of Washington who have a legitimate medical need for its therapeutic effects.
The Pierce County Superior Court granted Mr. Seeley's motion for summary judgment, finding that the placement of marijuana in schedule I of controlled substances violated his rights and liberties as protected by the Constitution of the State of Washington, art. I, §§ 12, 32. The State of Washington directly appealed from this judgment and this *609 court granted review pursuant to RAP 4.2(a)(2).

DISCUSSION

I. Independent Analysis Under The Privileges and Immunities Clause

Respondent asserts that classifying marijuana in schedule I of controlled substances violates the privileges and immunities clause of the Washington Constitution.
Respondent asserts that the privileges and immunities clause of the Washington Constitution affords the citizens of Washington greater protection than its federal counterpart, the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and, thus, requires an independent analysis based on the state constitutional provision. Respondent maintains that this court should apply the independent analysis adopted by the Oregon Supreme Court, whose state privileges and immunities clause is substantially identical to the Washington Constitution. See State v. Clark, 291 Or. 231, 630 P.2d 810, cert. denied, 454 U.S. 1084, 102 S.Ct. 640, 70 L.Ed.2d 619 (1981).[6]
Washington courts look to the six factors outlined in State v. Gunwall, 106 Wash.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4th 517 (1986), to determine whether a state constitutional provision extends broader rights than the Federal Constitution.
The first criterion involves an analysis of the textual language of the state constitutional provision, and the second criterion requires a comparison of the parallel state and federal provisions. Id. 106 Wash.2d at 61, 720 P.2d 808. Article I, section 12 of the Washington Constitution provides:
No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.
The Fourteenth Amendment of the United States Constitution provides, in pertinent part:
No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any state deprive any person life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
See State v. Smith, 117 Wash.2d 263, 285, 814 P.2d 652 (1991) (Utter, J., concurring).[7] Respondent contends that although the two provisions contain parallel rights, art. I, § 12 contains language that is "significantly different" from its federal counterpart. Respondent claims that the difference in the language suggests that the drafters meant something different from the federal provision. "Ordinary rules of textual and constitutional interpretation, as well as the logic of federalism, require that meaning be given to *610 the differences in language between the Washington and United States Constitutions." Smith, 117 Wash.2d at 285, 814 P.2d 652. Respondent also maintains that because Washington's provision was adopted from another state's constitution and not the Federal Constitution it was meant to be interpreted independently of the Federal Constitution.
While it may be true that there are some differences in the language, Respondent does not suggest what the differences signify nor what meaning should be given to the words in the state constitution. Moreover, in spite of similar augments, this court has repeatedly found these provisions substantially similar and treated them accordingly. State v. Manussier, 129 Wash.2d 652, 672, 921 P.2d 473 (1996); State v. Thorne, 129 Wash.2d 736, 771 n. 9, 921 P.2d 514 (1996); State v. Shawn P., 122 Wash.2d 553, 560-61, 859 P.2d 1220 (1993); Smith, 117 Wash.2d at 281, 814 P.2d 652; In re Borders, 114 Wash.2d 171, 175, 786 P.2d 789 (1990); Omega Nat'l Ins. Co. v. Marquardt, 115 Wash.2d 416, 430, 799 P.2d 235 (1990); City of Seattle v. Rogers Clothing for Men, Inc., 114 Wash.2d 213, 233, 787 P.2d 39 (1990); American Network, Inc. v. Utilities & Transp. Comm'n., 113 Wash.2d 59, 77, 776 P.2d 950 (1989).
The third factor involves an analysis of the state constitutional and common law history of the state constitutional provision. Gunwall, 106 Wash.2d at 61, 720 P.2d 808. Respondent notes that art. I, § 12 of the Washington Constitution was based on a similar provision of the Oregon Constitution, art. I, § 20. See Smith, 117 Wash.2d at 285, 814 P.2d 652 (Utter, J., concurring) (citing Journal of the Washington State Constitutional Convention, 1889, at 501 n. 20 (Beverly Paulik Rosenow ed.1962)). This provision was interpreted by the Oregon Supreme Court to require an analysis independent of the Fourteenth Amendment. See Clark, 291 Or. 231, 630 P.2d 810. Thus, Respondent argues that Oregon's constitutional history is persuasive when interpreting art. I, § 12 of the Washington Constitution. In reviewing the history of Oregon's provision the Oregon Supreme Court stated:
"The provisions of the state Constitution are the antithesis of the fourteenth amendment in that they prevent the enlargement of the rights of some in discrimination against the rights of others, while the fourteenth amendment prevents the curtailment of rights ...."
Smith, 117 Wash.2d at 285, 814 P.2d 652 (quoting Clark, 630 P.2d at 814 n. 8).
Although an interpretation of the Oregon provision may provide some guidance, Respondent provides no constitutional or common law history for the Washington provision at issue. This factor requires an analysis of the history of the Washington constitutional provision which was not met by the Respondent in this case.
The fourth factor to be addressed is preexisting state law. Gunwall, 106 Wash.2d at 61, 720 P.2d 808. "Previously established bodies of state law, including statutory law, may also bear on the granting of distinctive state constitutional rights." Id. Respondent admits that there is no preexisting state law regarding the use of marijuana, medically or otherwise. This indicates that using marijuana is not a right that the Washington Constitution was designed to protect.
Additionally, Appellant correctly notes that Washington's Constitution provides a constitutional grant of authority to the state legislature in the area of public health and the regulation of medicine and pharmacy. Const. art. XX, § 2 provides:
The legislature shall enact laws to regulate the practice of medicine and surgery, and the sale of drugs and medicines.
This article identifies Washington's unique historical interest in the regulation of drugs. The public health authority granted in art. XX had its origin even earlier in the territorial medical practice act of 1881 (Code of Wash., ch. 169, § 2285 (1881)). Constitutional history and pre-existing state law recognize that the Legislature has the authority to protect the public health and safety through the regulation of drugs. Thus, this factor supports the conclusion that greater protection under the state constitution does not exist in this context.
*611 The fifth criterion addresses the structural differences between the federal and state constitutions. Gunwall, 106 Wash.2d at 62, 720 P.2d 808. The United States Constitution is a grant of limited power authorizing the federal government to exercise only those constitutionally enumerated powers, whereas the state constitution imposes limitations on the otherwise plenary power of the state. Id. at 66, 720 P.2d 808. Our analysis in Gunwall indicates that this factor will always support an independent analysis under the state constitution. See Id. at 62, 66, 720 P.2d 808.
The last factor looks at whether the subject matter is of particular state or local concern, or if there appear to be a need for national uniformity. Id. at 62, 720 P.2d 808. Matters of state or local concern are more appropriately addressed by resorting to the state constitution. Id. Respondent asserts that, because he has been treated at a state-owned and regulated facility by a doctor who is licensed in this state, his access to medicine is an issue of local or state concern. Respondent also claims that the board of pharmacy's power to schedule and reschedule substances indicates that national uniformity is not needed when regulating controlled substances.
However, the substantial similarities between RCW 69.50 and the federal controlled substance law indicate that Washington's Uniform Controlled Substances Act is intended to be part of a uniform policy to control illegal drugs. See State v. McFadden, 63 Wash.App. 441, 447, 820 P.2d 53 (1991), review denied, 119 Wash.2d 1002, 832 P.2d 487 (1992) ("[a]doption by the Washington State Legislature of a uniform narcotics control statute substantially identical to the federal legislation is a clear statement that the matter is not one of special local concern but one as to which national and uniform policies are desirable"). The Uniform Controlled Substances Act has been adopted in some form by all 50 states, all of which place marijuana on schedule I. See Uniform Controlled Substances Act, 9 U.L.A. prefatory note at 2 (1988).
The Prefatory Note for the Uniform Controlled Substances Act summarizes the important interest in maintaining the integrity of uniform state and parallel federal law.
[The] Uniform [Controlled Substances] Act was drafted to achieve uniformity between the laws of the several States and those of the Federal government. It has been designed to complete the new Federal Narcotic dangerous drug legislation and provide an interlocking trellis of Federal and State law to enable government at all levels to control more effectively the drug abuse problem .... Much of [the] major increase in drug use and abuse is attributable to the increased mobility of our citizens .... [I]t becomes critical to approach ... this problem at the State and local level on a uniform basis.
Id. It is apparent that there is a need for national uniformity in the area of controlled substance regulation and that Washington's Uniform Controlled Substances Act was intended to be part of a national scheme.
In the present case, an independent analysis under the state constitution is not warranted. The analysis provided under factors four and six shows that the Respondent's interest in smoking marijuana as a medical treatment was not a right the Washington Constitution was designed to protect and that there is a recognized need for national uniformity when regulating controlled substances. We find that the protections under the state and federal provisions are coextensive in this context and we will utilize the federal equal protection analysis to resolve whether the placement of marijuana in schedule I of controlled substances violates art. I, § 12 of the Washington Constitution.

II. Equal Protection Analysis

In an equal protection analysis this court must first determine the standard of review against which to test the challenged legislation. Respondent contends that the legislative decision placing marijuana in schedule I threatens a fundamental right and is therefore entitled to strict scrutiny. If governmental action threatens a "fundamental right," the classification will be upheld only if it is necessary to accomplish a compelling state interest. Smith, 117 Wash.2d at 277, 814 P.2d 652.
*612 This court has held that "[t]he right to smoke marijuana is not fundamental to the American scheme of justice, it is not necessary to ordered liberty, and it is not within a zone of privacy." State v. Smith, 93 Wash.2d 329, 346-47, 610 P.2d 869, cert. denied, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980). Other federal and state courts have agreed that possession of marijuana is not a fundamental right guaranteed by the United States Constitution. See National Organization for the Reform of Marijuana Laws v. Bell, 488 F.Supp. 123 (D.D.C.1980); State v. Anonymous, 32 Conn.Supp. 324, 355 A.2d 729 (1976); Commonwealth v. Leis, 355 Mass. 189, 243 N.E.2d 898 (1969); People v. Alexander, 56 Mich.App. 400, 223 N.W.2d 750 (1974); Kreisher v. State, 319 A.2d 31 (Del.Super.1974).
However, Respondent contends the right infringed is not a general right to smoke marijuana but, rather, a right to have marijuana prescribed as his preferred medical treatment for the nausea and vomiting associated with chemotherapy. Citing Bering v. Share, 106 Wash.2d 212, 721 P.2d 918 (1986), cert. dismissed, 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987), Respondent claims this court recognized that a physician has a fundamental right to practice medicine. Respondent argues that this fundamental right should encompass the right of a patient to have the aid of his physician to relieve his suffering.
Contrary to Mr. Seeley's argument, this court in Bering did not create a fundamental right of a physician to practice medicine. See Bering, 106 Wash.2d 212, 721 P.2d 918. In Bering, we held that geographical limitations on picketing outside a medical building which performed abortions did not violate federal or state free speech rights. Id. Respondent incorrectly asserts that this court established a "fundamental" right of physicians to practice medicine, and, therefore, his argument is without merit.
Citing the United States Supreme Court decision in United States v. Rutherford, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979), Appellant states that a terminally ill individual does not have a constitutional right to access unapproved medicines. In Rutherford, a group of terminally ill cancer patients sued to enjoin the federal government from interfering with interstate transportation of laetrile, a drug not approved as "safe and effective" under the Federal Food, Drug and Cosmetic Act. Id. at 546, 99 S.Ct. at 2472-73. Although the Supreme Court did not directly address the patients' claim that they had a constitutionally protected "privacy" right to use laetrile. Justice Marshall's opinion for a unanimous Court emphasized the special dangers presented for terminal patients by ineffective drugs, the wide variety of products whose producers claim have curative properties, and the difficulty of reviewing all such claims and products. Id. at 556, 99 S.Ct. at 2477-78.
On remand the United States Court of Appeals for the Tenth Circuit did address and reject the constitutional challenge based on the patients' right to privacy. The Tenth Circuit found that, although a decision by a patient whether to have a treatment or not is a protected right, the "selection of a particular treatment, or at least a medication, is within the area of governmental interest in protecting public health." Rutherford v. United States, 616 F.2d 455, 457 (10th Cir.), cert. denied, 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980). Other courts have agreed with the Tenth Circuit that the selection of a particular treatment or medicine is not a constitutionally protected right. See Carnohan v. United States, 616 F.2d 1120 (9th Cir.1980) (the Ninth Circuit found that constitutional rights of privacy and personal liberty did not give the plaintiff the right to obtain laetrile free of lawful exercise of government police power); Kulsar v. Ambach, 598 F.Supp. 1124 (W.D.N.Y.1984) (medical patients had no constitutional right to a drug treatment which the FDA ordered removed from the marketplace).
Similarly, the California Supreme Court held that the right to obtain drugs of unproven efficacy is not a fundamental right. People v. Privitera, 23 Cal.3d 697, 591 P.2d 919, 925-26, 153 Cal.Rptr. 431, 5 A.L.R.4th 178, cert. denied, 444 U.S. 949, 100 S.Ct. 419, 420, 62 L.Ed.2d 318 (1979). In Privitera, defendants were convicted of conspiracy to sell and to prescribe the unapproved drug *613 laetrile intended for the alleviation or cure of cancer. Id. 153 Cal.Rptr. at 433-34, 591 P.2d at 921. Defendants claimed the California statute violated the right of privacy protected by the federal and California constitution. Id. The court stated:
Whether cancer patients especially advanced cancer patients who have unsuccessfully sought relief from conventional therapy and who are fully informed as to the consensus of scientific opinion concerning the drug should have access to laetrile is clearly a question about which reasonable persons may differ. It is not our function to render scientific or legislative judgments. Rather, we must resolve a narrow question: Does the challenged legislation bear a reasonable relationship to the achievement of the legitimate state interest in the health and safety of its citizens? We conclude section 1707.1 does satisfy this standard and that it therefore does not encroach upon the federal constitutional right of privacy.
Id. 153 Cal.Rptr. at 437-38, 591 P.2d at 925-26.
Here, Respondent asserts a constitutionally protected interest in having his physician prescribe marijuana, an unapproved drug which is regulated as a Schedule I controlled substance, for medical treatment. In an equally compelling case, the United States Supreme Court recently held that terminally ill patients do not have a constitutionally protected right to physician assisted suicide nor did they constitute a suspect class for purposes of an equal protection analysis.[8]Vacco v. Quill, ___ U.S. ___, ___, 117 S.Ct. 2293, 2297, ___ L.Ed.2d ___ (1997). Thus, it is apparent from the case law that although the Respondent is facing a terminal illness, he is not part of a suspect class nor does he have a fundamental right to have marijuana prescribed as his preferred treatment over the legitimate objections of the state.
Respondent argues that if this court does not apply the strict scrutiny analysis then the heightened or intermediate scrutiny should apply. Under intermediate scrutiny the legislation must further a substantial interest of the state. State v. Coria, 120 Wash.2d 156, 170, 839 P.2d 890 (1992). However, Respondent cites no authority supporting his assertion that the right to access an unapproved, controlled substance as treatment for a medical condition is an "important right" or that cancer patients are a semi-suspect class. As noted above, other courts have applied a rational basis analysis where terminally ill patients have asserted a right to be treated with an unapproved drug. Carnohan, 616 F.2d at 1122; Privitera, 153 Cal. Rptr. at 437-39, 591 P.2d at 925-26. Moreover, this court and other state and federal courts have consistently applied the rational basis test when deciding whether marijuana's classification as a schedule I controlled substance violates equal protection. See generally Smith, 93 Wash.2d 329, 610 P.2d 869; National Organization for the Reform of Marijuana Laws v. Bell, 488 F.Supp. 123 (D.D.C.1980); State v. Hanson, 364 N.W.2d 786 (Minn.1985). Thus, the rational basis test is the appropriate standard against which to test the challenged legislation.
Under the rational basis test the challenged law must be rationally related to a legitimate state interest. The legislation will be upheld unless the classification rests on grounds wholly irrelevant to the achievement of a legitimate state objective. State v. Shawn P., 122 Wash.2d at 561, 859 P.2d 1220. Legislative acts are presumed constitutional and this court will not find otherwise unless proved so beyond a reasonable doubt. Id. The rational basis test requires only that the means employed by the statute be rationally related to legitimate state goals, and not that the means be the best way of achieving that goal. Id. In looking for a rational relationship the court may assume the existence of any necessary state of facts which it can reasonably conceive. Smith, 93 Wash.2d at 336, 610 P.2d 869. The party challenging the legislation "must show, beyond a reasonable doubt, that no state of facts exists or can be conceived sufficient to justify the challenged *614 classification, or that the facts have so far changed as to render the classification arbitrary and obsolete." Id. at 337, 610 P.2d 869.
On its face, the classification of marijuana does not treat anyone differently than anyone else or draw any distinctions between persons. Everyone, regardless of their medical condition, is prohibited from obtaining the substance. "`Generally speaking, laws that apply evenhandedly to all `unquestionably comply' with the Equal Protection Clause.'" Vacco, ___ U.S. at ___, 117 S.Ct. at 2298 (quoting New York City Transit Auth. v. Beazer, 440 U.S. 568, 587, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979)).
Respondent argues that (1) no rational basis exists for classifying marijuana as a schedule I controlled substance, and (2) comparable drugs such as cocaine, morphine, and methamphetamines are not similarly classified. First, we will address Respondent's contention that marijuana's placement on schedule I is irrational because it is an effective medical treatment for the nausea and vomiting associated with chemotherapy.
To support his argument that marijuana's classification is purely arbitrary, Respondent cites to an opinion and recommended ruling by Administrative Law Judge (ALJ) Young in response to a petition by NORML before the Drug Enforcement Administration (DEA) to reschedule marijuana, asserting that the drug had an accepted medical use.[9] Judge Young heard testimony and reviewed evidence on both sides of the issue. In September 1988, Judge Young issued his ruling and concluded:
The evidence in this record clearly shows that marijuana has been accepted as capable of relieving the distress of great numbers of very ill people, and doing so with safety under medical supervision. It would be unreasonable, arbitrary and capricious for the DEA to continue to stand between those sufferers and the benefits of this substance in light of the evidence in this record.
CP at 24 ("Opinion And Recommended Ruling, Finding Of Fact, Conclusion Of Law And Decision Of Administrative Law Judge In The Matter Of Marijuana Rescheduling Petition, Docket No. 86-22, U.S. Department of Justice, Drug Enforcement Administration" (1988) (hereinafter Young Opinion)). Based on Judge Young's ruling, Respondent asks this court to determine that retaining marijuana in schedule I is arbitrary, and, therefore, unconstitutional under art. I, § 12 of the Washington Constitution.
The Administrator of the DEA, however, did not follow the ALJ's recommended ruling and retained marijuana on schedule I. The ALJ determined that a respectable minority of physicians who advocated marijuana's medical use was sufficient to show that marijuana had an "accepted medical use." CP at 24. The Administrator declined to follow the ALJ's standard for "accepted medical use" because it lacked scientific credibility.[10] CP *615 at 24. During the administrative process an extensive evidentiary record was developed which included a great deal of expert testimony for and against changing marijuana's rescheduling. The Administrator found the evidence submitted and relied upon by experts supporting the reclassification of marijuana to schedule II was anecdotal, and, therefore, did not warrant a change in marijuana's classification.
Furthermore, scientifically reliable evidence showed that currently available therapies are more effective and do not carry with them the same risks which are attributable to marijuana. The Administrator's decision to retain marijuana in schedule I was upheld by the United States Court of Appeals for the District of Columbia in Alliance for Cannabis Therapeutics v. Drug Enforcement Admin., 15 F.3d 1131 (D.C.Cir.1994). For this court to rely on the recommended ruling by the Administrative Law Judge would be the equivalent of relying on a decision by a trial court which has been reversed on appeal.
The only case law the Respondent cites to support his position is a Washington Court of Appeals decision, State v. Diana, 24 Wash. App. 908, 604 P.2d 1312 (1979). Respondent's reliance on Diana, however, is misplaced as the court did not address the constitutionality of marijuana's scheduling. The Court of Appeals in Diana recognized that, under limited circumstances, an individual may assert a medical necessity defense to a criminal marijuana possession charge. Id. at 913, 604 P.2d 1312. The recognition of a potential medical necessity defense for criminal liability of marijuana possession is not relevant in this equal protection analysis.
This court and other federal and state courts have reviewed evidence similar to that which has been submitted in this case and have all upheld the constitutionality of marijuana's classification. We upheld marijuana's classification as a controlled substance on equal protection grounds in Smith, 93 Wash.2d 329, 610 P.2d 869. In Smith, individuals appealing criminal convictions made a facial equal protection challenge to the Legislature's classification of marijuana, providing evidence to the court advocating marijuana's safety. Finding that experts disagree regarding the seriousness of marijuana's effects, we refused to substitute our judgment for that of the Legislature. Id. at 337, 610 P.2d 869. We emphasized the Legislature's right to exercise its police power to regulate the prescription and use of dangerous drugs and found that marijuana's classification was reasonably related to the legitimate interests of the state. Id. at 338-39, 610 P.2d 869.
In State v. Dickamore, 22 Wash.App. 851, 592 P.2d 681 (1979), the Court of Appeals rejected a similar equal protection challenge, stating:
[S]o long as scientists disagree about the effect of marijuana, the legislature is free to adopt the opinions of those scientists who view marijuana as harmful. We will not substitute our judgment for that of the legislature where the statute in question bears a rational relationship to a legitimate legislative purpose.
Id. at 855, 592 P.2d 681.
Although not an equal protection challenge, this court discussed marijuana's schedule I classification in State v. Palmer, 96 Wash.2d 573, 637 P.2d 239 (1981). We held that the state board of pharmacy did not abuse its discretion when it declined to remove marijuana from schedule I in view of testimony that there was not a general, accepted medical use for marijuana, although some doctors had recommended its use to patients for the treatment of some diseases. Id. at 575-77, 637 P.2d 239.
Within a month of the Palmer decision this court also addressed another appeal from a marijuana conviction in State v. Whitney, 96 Wash.2d 578, 637 P.2d 956 (1981). In Whitney, this court rejected the argument that after the enactment of the Controlled Therapeutic Research Act of 1979, marijuana's classification as a schedule I drug no longer had a rational relationship to a legitimate state purpose. Appellant stated that the *616 Research Act[11] recognized potential medical uses of marijuana for cancer and glaucoma sufferers and noted that marijuana can be in schedule I only if it has no accepted medical use. Id. at 583, 637 P.2d 956. We found the legislation did not manifest a finding that marijuana has an accepted medical use or that it is safe for use under medical supervision and held that the retention of the drug in schedule I was reasonably related to a legitimate state purpose. Id. Thus, Washington appellate courts have already examined and upheld the rationality of the Legislature's placement of marijuana in schedule I in light of any potential medical use.
Federal and state courts have also uniformly upheld the classification of marijuana as a controlled substance against equal protection challenges.[12]
The State maintains that placing marijuana in schedule I is rationally related to the state's dual interest in controlling potential drug abuse and assuring efficacy and safety in medicines. Respondent argues that placing marijuana in schedule I is not rationally related to the State's purpose of preventing drug abuse. Respondent maintains that placing marijuana in schedule II could not possibly contribute to the drug abuse problem because marijuana would be available only by prescription. However, the Legislature could reasonably consider marijuana's widespread availability and its pattern of abuse as requiring a different legislative response than to other substances. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." Williamson v. Lee Optical, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563, reh'g denied, 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256 (1955).
Respondent also contends that the placement of marijuana in schedule I is irrational because it is a safe and effective medicine for controlling the vomiting and nausea associated with cancer chemotherapy. He argues that marijuana has an "accepted medical use" and, therefore, cannot be placed in schedule I. Respondent relies primarily on the testimony of Dr. Lester Grinspoon, associate clinical professor of psychiatry at Harvard Medical School and specialist in psychoactive drugs, and Dr. Ernest Conrad, an orthopedic physician at the University of Washington School of Medicine and Mr. Seeley's treating physician for nine years.
Dr. Grinspoon offered testimony advocating the safety and benefits of using marijuana as a medicine. He contends that marijuana is one of the safest drugs available, stating there has never been a documented overdose. Based on anecdotal testimony from cancer patients, Dr. Grinspoon contends that marijuana is more effective than other new generation antiemetic drugs such as ondansetron Dr. Grinspoon admits that smoking marijuana carries the same risks associated with smoking cigarettes and that marijuana may even contain more particulate matter than cigarettes. However, he notes that a cigarette smoker smokes in far greater quantities than a cancer chemotherapy patient, who will smoke a marijuana cigarette *617 only until the nausea symptoms subside.
The Respondent also offered testimony of his physician, Dr. Ernest Conrad, who stated that he would prescribe marijuana if it were legally available. Dr. Conrad maintained that for some of his patients, including Mr. Seeley, smoking marijuana is an effective means to control the nausea and vomiting associated with cancer chemotherapy. He admits that his opinions are not based on scientific evidence but, rather, on claims of patients who have found that it alleviates their symptoms.
In response, the State provided testimony of several physicians who do not advocate the use of marijuana as a medicine. Dr. Janet Lapey, a pathologist and executive director of Concerned Citizens for Drug Prevention, has also studied the scientific research and medical literature regarding marijuana's potential use as a medicine. However, unlike Dr. Grinspoon, she has concluded that marijuana has no currently accepted use in the treatment of any medical condition. Dr. Lapey notes that marijuana is a complex mixture of over 400 chemicals, which increases to 2,000 when smoked. Among those 400 chemicals, there are at least 61 identified cannabinoids, the active ingredients in marijuana. The amount of the active ingredients, including THC, can vary depending on the growing condition of the plant. Dr. Lapey explains that to gain approval as a medicine a substance must be capable of precise chemical quantification of all ingredients. Dr. Barry Logan, a toxicologist for the State of Washington, explains that with a marijuana plant there is no way to create a standardized dosing system because there is no singularly identifiable and/or chemically consistent plant. Thus, he concludes this quality renders the plant form of marijuana incapable of establishment of standards for the accepted safety for use in treatment under medical supervision.
Dr. Lapey also notes that marijuana has been rejected as a medicine by the American Medical Association, the American Cancer Society, the National Multiple Sclerosis Society, the American Glaucoma Society, the Food and Drug Administration, and the American Academy of Ophthalmology. Dr. Lapey states that no scientifically credible evidence exists which supports the conclusion that marijuana is an effective medicine. Dr. Lapey maintains that when compared against other currently available medications there is no support for using marijuana as a medicine.
Dr. Daniel Brookoff, a specialist in medical oncology, also testified that marijuana is not an effective medication. He states that in the last 15 years other drugs, such as ondansetron, have been developed that have proved to be safer and far more effective in treating the nausea and vomiting associated with chemotherapy.[13] He maintains that these drugs have proved to be safe and effective for both adults and children and, generally, produce only mild side effects. Dr. Brookoff notes that although the synthesized form of THC has been shown to have some anti-nausea effects, it has found limited use because it is not particularly effective. It is used only as a third line of treatment, administered only when other drugs have failed. Mr. Seeley's physician, Dr. Conrad, also gave testimony supporting Dr. Brookoff's statements. Dr. Conrad also stated that ondansetron has proven to be a more effective drug in the last few years for chemotherapy than other drugs and that most medical oncologists will only use Marinol, synthesized THC, when other drugs have not proven to be effective.
Dr. Brookoff stated that for physicians the issue of whether inhaled marijuana should be used as an anti-emetic was settled in 1984 when Dr. Levitt and colleagues conducted a randomized, double-blind comparison of synthesized THC and marijuana for the treatment of nausea and vomiting associated with chemotherapy.[14] The study found that neither *618 substance was particularly effective in treating nausea and vomiting with 75 percent of patients in both groups still suffering significant nausea and vomiting. Moreover, among those who found the substances to be effective, the majority preferred the synthesized form of THC as opposed to marijuana. Dr. Brookoff states that marijuana adds nothing to the limited benefits of synthesized THC. Marijuana does, however, have negative side effects not associated with synthesized THC. Because marijuana is smoked it contains carcinogens and particulate matter associated with cigarette smoking and the danger of infection from fungus,[15] which is often found in marijuana cigarettes. Dr. Lapey notes that even when a person smokes fewer than one marijuana cigarette per day, significant changes in pulmonary function and respiratory function are found.[16]
Dr. Brookoff maintains that any potential benefits from the use of marijuana have been eclipsed by the development of safer and more effective drugs.[17] Thus, he concludes that there is no therapeutic use for marijuana.[18] All that is left are the hazards associated with smoking marijuana, which include lung disease, cardiac dysfunction, brain damage, genetic damage, immune disorders and psychomotor impairment. Additionally, Dr. Brookoff notes that in 1994 various components of the National Institutes of Health conducted a review of the scientific literature concerning the therapeutic uses of marijuana. They concluded that no evidence suggests that marijuana is superior to currently available medications for a variety of illnesses including nausea and vomiting associated with cancer chemotherapy and that the risks associated with using smoked marijuana mitigate against its therapeutic use.
The challenged legislation involves conclusions concerning a myriad of complicated medical, psychological and moral issues of considerable controversy. We are not prepared on this limited record to conclude that the legislature could not reasonably conclude that marijuana should be placed in schedule I of controlled substances. It is clear not only from the record in this case but also from the long history of marijuana's treatment under the law that disagreement persists concerning the health effects of marijuana use and its effectiveness as a medicinal drug. The evidence presented by the Respondent is insufficient to convince this court that it should interfere with the broad judicially recognized prerogative of the legislature. Respondent has not shown that the legislative treatment of marijuana is "so unrelated" to the achievement of the legitimate purposes of the legislature or that "the facts have so far changed as to render the classification arbitrary and obsolete." See Smith, 93 Wash.2d at 337, 610 P.2d 869.
Additionally, Washington's Uniform Controlled Substances Act contains a mechanism by which evidence may be presented to the board of pharmacy to determine whether a drug should be reclassified. The very existence of this statutory scheme indicates that the Legislature intended flexibility and receptivity to the latest scientific information. This scheme is a sensible mechanism for dealing with a field in which factual claims are conflicting and the state of scientific knowledge is still growing. This is the antithesis of irrationality which the Respondent attributes to the Legislature. See Bell, 488 F.Supp. at 141; Kiffer, 477 F.2d at 357. Thus, the determination of whether new evidence *619 regarding marijuana's potential medical use should result in the reclassification of marijuana is a matter for legislative or administrative, not judicial, judgment.
Respondent also attacks the rationality of the classification scheme, arguing that it is under inclusive. Respondent makes an equal protection challenge asserting that marijuana's classification is irrational because other more harmful substances such as cocaine, morphine, and methamphetamines are not similarly classified in schedule I and, thus, can be prescribed by a physician. Respondent also maintains that it is arbitrary to place marijuana in schedule I while classifying the synthetic form of THC, otherwise known as Marinol, in schedule II.
"`Underinclusive classifications do not include all who are similarly situated with respect to a rule, and thereby burden less than would be logical to achieve the intended government end.'" National Organization For the Reform of Marijuana Laws v. Bell, 488 F.Supp. 123, 137 (D.D.C.1980) (quoting Laurence H. Tribe, American Constitutional Law § 16-4, at 997 (1978)). To prevail in such a claim the plaintiff must show that the governmental choice is "`clearly wrong, a display of arbitrary power, not an exercise of judgment.'" Id. (quoting Mathews v. De Castro, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976)). The court notes that few challengers can overcome this heavy burden of proof. The court explains that legislative bodies have broad discretion in attacking social ills. "A State may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed." Id. Thus, the court concluded that failure to include alcohol and tobacco in the regulatory scheme did not render the statute unconstitutional. Id.[19]
The Washington Court of Appeals rejected the same argument in Dickamore. The defendant in Dickamore argued that marijuana's classification violated equal protection because comparable drugs such as nicotine and alcohol are not similarly classified. The court concluded that the Legislature is not constitutionally compelled to regulate or prohibit all harmful substances. Dickamore, 22 Wash.App. at 854, 592 P.2d 681 (citing United States v. Kiffer, 477 F.2d 349, cert. denied, 414 U.S. 831, 94 S.Ct. 165, 38 L.Ed.2d 65 (1973)). "`It may conclude that half a loaf is better than none.'" Id. (quoting Kiffer, 477 F.2d at 355). Thus, the court held the classification of marijuana did not violate equal protection.
In light of this policy of legislative freedom when confronting social problems, the exclusion of other potentially more harmful drugs from schedule I does not render the scheme unconstitutional. That cocaine or morphine have adverse health effects does not mean that placing these substances in schedule I is the best means of regulating these substances, or that marijuana should be treated similarly. The fact that cocaine, morphine, and methamphetamines have all been approved for medical use and marijuana has not is sufficient reason for treating the substances differently. Likewise, the synthesized form of THC has been approved for medical use. Marijuana, unlike synthesized THC contains over 400 different chemicals and there is no way to create a standardized dosing system because there are no chemically consistent plants. The differences between marijuana and synthesized THC, in addition to the health risks associated with inhaled marijuana, justify the Legislature's decision to treat the substances differently.[20]

*620 III. Frequent Recurrence to Fundamental Principles Analysis

Respondent asserts that the Legislature's placement of marijuana in schedule I of controlled substances violates art. I, § 32 of the Washington Constitution, which provides "[a] frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." Respondent maintains that art. I, § 32 protects the personal liberties of the citizens of Washington to a greater extent than the Federal Constitution and, to this end, provides a Gunwall analysis.
In his analysis of the first two Gunwall factors Respondent asserts that because there is no equivalent federal counterpart to art. I, § 32 this court should find greater protection under these factors. We agree this provision must necessarily be independently analyzed to determine whether it affords the Respondent protection in this context.
Respondent notes that although art. I, § 32 had historical precedents, the precise language used in the Washington constitution was unique. See Brian Snure, A Frequent Recurrence to Fundamental Principles: Individual Rights, Free Government, and the Washington State Constitution, 67 Wash.L.Rev. 669, 676 (1992). A reminder to consider "fundamental principles" was originally seen in the first American Declaration of Rights written by George Mason in 1776. See Id. (citing Va. Const. art. I, § 15 ("Qualities necessary to preservation of free government. That no free government, nor the blessings of liberty can be preserved to any people, but by a firm adherence to justice, moderation, temperance, frugality, and virtue; by frequent recurrence to fundamental principles.")). By 1889, nine states adopted *621 similar provisions in their state constitutions. See Id.[21] However, unlike some state constitutions, Washington did not limit the return to fundamental principles to those "of the constitution." See Id.[22] Thus, Respondent maintains that the framers chose not to include the language of other similar provisions that would limit art. I, § 32 to fundamental principles delineated within the constitution. Additionally, the Washington Constitution diverges from similar provisions by ensuring the "security of individual right." See Id. This connection to individual rights was unique to the Washington constitution. See Id.
The original proposed Washington Constitution by Liard Hill contained only 31 sections in art. I. See Id. at 674. Section 32 was proposed by George Turner, whose later speeches as a U.S. Senator lead to the conclusion that Turner, like others of his day, believed that constitutional interpretation often required a return to natural law principles beyond the four corners of the constitution. See Id. (citing 32 CONG. REC. 783, 785, 789 (1899) (statements of Senator Turner against United States imperialism in the Philippines)).
Respondent notes that Brian Snure has argued persuasively that the phrase "frequent recurrence to fundamental principles" suggests that the framers retained the notion that natural rights should be considered when protecting individual rights. See Id. at 687. Snure states that "[s]ection 32 designates extra-constitutional fundamental principles as essential to the security of individual rights." See Id. Additionally, Justice Utter, in his concurring opinion in Southcenter Joint Venture v. National Democratic Policy Comm., 113 Wash.2d 413, 439, 780 P.2d 1282 (1989), argued that section 32 was evidence of the framers' belief in natural law, stating "the notion of fundamental principles was central to natural law theories at the time [the constitution was adopted]. That the principles are not spelled out further indicates that the framers looked to other non-governmental sources for the origin of the rights listed in the constitution." Id. Justice Utter used this clause as a substantive basis for the protection of rights. Id. Thus, Respondent argues that by adopting art. I, § 32 the framers intended to expand the scope of individual rights protected by the constitution.
Whether art. I, § 32 can be used to expand the scope of protection of substantive individual rights beyond those recognized by the state and federal constitution is not clear. The "frequent recurrence to fundamental principles" clause of the Washington Constitution has been used infrequently by the judiciary. It has been cited in approximately twenty-five opinions, less than half of which are majority opinions. Washington courts have used this provision primarily as an interpretive mechanism. For example, art. I, § 32 has been cited as a reason for analyzing principles supporting a right to privacy, State v. Curran, 116 Wash.2d 174, 188-89, 804 P.2d 558, 566 (1991) (Utter, J., concurring); City of Bremerton v. Smith, 31 Wash.2d 788, 800, 199 P.2d 95 (1948) (Simpson, J., dissenting); the right to free speech, State v. Reece, 110 Wash.2d 766, 790, 757 P.2d 947 (1988) (Utter, J., dissenting), cert. denied, 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 26 (1989); the right to an insanity defense, State v. Strasburg, 60 Wash. 106, 113, 110 P. 1020 (1910); and the restrictions on search and seizure, State v. Mark, 36 Wash.App. 428, 436, 675 P.2d 1250 (1984) (Ringold, J., addendum opinion); State v. Broadnax, 25 Wash.App. 704, 718, 612 P.2d 391 (1980) (Ringold, J., dissenting).
Article I, § 32 has also been cited to define principles of state and local government, Goodnoe Hills Sch. Dist. No. 24 v. Forry, 52 Wash.2d 868, 875, 329 P.2d 1083 (1958); *622 Wheeler Sch. Dist. No. 152 v. Hawley, 18 Wash.2d 37, 38, 137 P.2d 1010 (1943); to establish a separation of powers argument, State ex rel. Swan v. Jones, 47 Wash.2d 718, 742, 289 P.2d 982 (1955) (Donworth, J., dissenting); State ex rel. Robinson v. Fluent, 30 Wash.2d 194, 240, 191 P.2d 241, cert. denied, 335 U.S. 844, 69 S.Ct. 66, 93 L.Ed. 394 (1948) (Simpson, J., dissenting); and to support the right to an impartial trial, State ex rel. McFerran v. Justice Court of Evangeline Starr, 32 Wash.2d 544, 548, 202 P.2d 927 (1949); State v. Espinoza, 51 Wash.App. 719, 722, 754 P.2d 1287 (1988), rev'd. in part by, 112 Wash.2d 819, 774 P.2d 1177 (1989).
Washington jurisprudence has yet to see a consistent approach to art. I, § 32. Nevertheless, Respondent fails to identify a natural right, in existence at the time of the constitution's adoption, to use marijuana or to choose a particular medical treatment. Instead, it appears the framers intended such discretion to rest in the government as indicated by its adoption of art. XX, § 2. Neither constitutional history or pre-existing state law indicate that using marijuana is a right that the Washington Constitution was designed to protect. Thus, art. I, § 32 was not meant to provide a substantive right to use marijuana for medical treatment free from the lawful exercise of government police power.

CONCLUSION
The privileges and immunity clause of the Washington Constitution does not provide greater protection than the Fourteenth Amendment of the Federal Constitution in the area of drug classification. The texts of the two provisions are similar and have routinely been interpreted by this Court as coextensive. In this case, there is no historical basis to conclude that the framers of the Washington Constitution intended to extend greater rights to citizens of this State to follow a physician prescribed course of drug treatment free of government regulation than provided under the Federal Constitution. To the contrary, art. XX, § 2 of the Washington Constitution provides: "The legislature shall enact laws to regulate the sale of drugs and medicine...."
Moreover, Washington's Uniform Controlled Substances Act was intended to be part of a national scheme to enable governments at all levels to more efficiently control problems with drug abuse. Both federal and state statutes list marijuana in Schedule I of controlled substances. Controlled substances listed in Schedule I under federal law may not be prescribed or dispensed anywhere in the United States unless a specific registration to do so is obtained. Thus, marijuana cannot be legally prescribed, nor can a prescription for marijuana be filled by a pharmacist in Washington unless a federal registration is granted.
We agree with the courts, including the Ninth Circuit, the Tenth Circuit, and the California Supreme Court, considering the question of access to unapproved drugs. All have found that the rights of privacy and personal liberty do not establish a fundamental right to drug treatment free of government police power. Accordingly, the regulation here is appropriately analyzed under a rational basis test. Under that test, Respondent has failed to show that the Legislature's decision regarding classification of marijuana is "so unrelated" to the achievement of legitimate purposes that the classification is arbitrary or obsolete. Respondent can point to no scientific studies which was presented to the Legislature regarding the efficacy of marijuana for medicinal purposes. Additionally, the record in this case does not point to any scientific studies, since the Legislature's decision to place marijuana in Schedule I, indicating marijuana's efficacy as a medical treatment. The record, however, does reference scientifically relevant evidence that therapies developed over the last fifteen years have proven to be safer and more effective in treating the side effects of chemotherapy than leaf marijuana without the risks attributable to marijuana.
Because substantial evidence is available to support the Legislature's action, we decline to interfere with the broad judicially recognized prerogative of the Legislature particularly where the challenged legislation involves a myriad of complicated medical, physiological, and moral issues and substantial evidence is available to support the Legislature's *623 action. The debate over the proper classification of marijuana belongs in the political arena.
Finally, we conclude that art. I, § 32, frequent recurrence to fundamental principles clause, read in conjunction with art. XX, § 2, does not create a right to use marijuana for medical treatment free from the lawful exercise of government police power.
In order to prevail, the Respondent had the burden to show that the Legislature's placement of marijuana in schedule I was unconstitutional beyond a reasonable doubt. See Smith, 93 Wash.2d at 329, 610 P.2d 869. That burden has not been met in this case. Thus, we reverse the Superior Court's decision and conclude that RCW 69.50.204(c)(14) does not violate art. I, §§ 12, and 32 of the Washington Constitution.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, ALEXANDER and TALMADGE, JJ., concur.
SANDERS, J., dissents.
SANDERS, Justice, dissenting.
"When our rulers worry about our health, we should worry about our liberty."[1]
The trial court, and the majority here, analyze Mr. Seeley's claim under the privileges and immunities clause of article I, section 12, of the Washington Constitution[2] as well as the equal protection clause of the Fourteenth Amendment to the United States Constitution.[3] Notwithstanding, I prefer the due process clause of the Fourteenth Amendment, as argued by amicus American Civil Liberties Union of Washington Foundation because the problem is how the government treats Mr. Seeley, not that Mr. Seeley is treated differently from others.[4] Equalizing injustice does not cure it. I dissent.
This dissent relies primarily on recent Supreme Court precedent in two abortion cases, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Planned Parenthood v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 2806-07, 120 L.Ed.2d 674 (1992), wherein the Supreme Court majority credited the state's interest to preserve the life of the fetus as "important" but nevertheless insufficient to prohibit the practice when measured against the liberty interests of the mother. The majority cannot distinguish these cases. If the state cannot prohibit abortions consistent with due process, it can hardly constitutionally prohibit drug use as its interest to do so is arguably much less important. I further rely on Ravin v. State, 537 P.2d 494 (Alaska 1975) which construes a comparable provision in the Alaska constitution to immunize persons who smoke marijuana in the privacy of their home from criminal prosecutions, as well as Washington v. Glucksberg, ___ U.S. ___, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) which rejects the claim that due process protects the asserted right of physician assisted suicide however still provides much comfort to Mr. Seeley, who claims due process protection against "arbitrary impositions and purposeless restraints."[5]
*624 While the majority identifies Mr. Seeley as presenting his case pro se this dissent notes for the record Mr. Seeley is a most able attorney as well. On this occasion he comes to court on his own behalf to argue a matter of a very personal nature directly pertaining to physical pain which only he can experience. By contrast considerations of public need and necessity are at most lawyer-like abstractions. Refusing palliative relief to a dying man may please the politicians yet does great damage to Seeley's liberty and nothing for his health.
As to Mr. Seeley's claim that inhalation of leaf form marijuana subsequent to chemotherapy relieves symptoms of nausea, the State admitted during oral argument it "cannot dispute Mr. Seeley's beliefs about marijuana and how it affects him...." Oral Argument Tape (Sept. 25, 1996). Seeley's medical doctor filed an affidavit attesting that in his medical judgment Mr. Seeley would benefit from the use of marijuana.[6]
But the State purports to justify this total prohibition of marijuana by taking a "larger focus." It asserts absolute criminal prohibition, even as applied to Mr. Seeley, promotes legitimate governmental objectives associated with discouraging drug abuse and otherwise protecting the citizenry from itself by curtailing what it alleges to be the unknown consequences associated with the inhalation of marijuana. But these reasonseven if validhave no particular application to Seeley who is terminally ill, admittedly finds relief in smoking marijuana, and seeks to follow the advice of his own physician who attests marijuana is medically advisable. From the perspective of one writhing in nausea on the tiled floor of an oncological recovery room, the State's justifications to withhold the blessings of relief are more sophomoric than substantive.[7]
The text of the Fourteenth Amendment's due process clause mandates no state shall "deprive any person of life, liberty, or property, without due process of law." The clause views the matter from the individual's perspective, not the State's, as it poses the rule in terms of "any person" who might suffer the deprivation.[8] Its remedy is simple, and absolute: prohibit the deprivation absent that process which is due.
That the process due extends beyond matters of mere procedure is thoroughly settled. Justice Brandeis explained 70 years ago, "[d]espite arguments to the contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the federal Constitution from invasion by the states." Whitney v. California, 274 U.S. 357, 373, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). See also Planned Parenthood v. Casey, 505 U.S. 833, 846, 851, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992) (while the clause appears to address procedure alone, the liberty protections referred to in the clause include a substantive component "`barring certain government actions regardless of the fairness of the procedures used to implement them'") (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).
It may also be reasonably stated, without fear of contradiction, that over the last century the clause has regained much of its vigor as a substantive limitation on state power. An early test for judicial implementation of the clause is summarized in Lawton *625 v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894). There the Supreme Court noted that a legislative "determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts" (id. at 137, 14 S.Ct. at 501) and emphasized the need to protect against governmental acts "involving an unnecessary invasion of [] rights" and infringement upon individual acts which are "harmless in themselves, and which might be carried on without detriment to the public interests." Id. at 138, 14 S.Ct. at 501.
To justify the state in ... interposing its authority in behalf of the public, it must appearFirst, that the interests of the public ... require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.
Id. at 137, 14 S.Ct. at 501.
If the challenged governmental act fails any aspect of the test it is an invalid exercise of the police power and an unconstitutional "public encroachment upon private interests." Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962) ("The classic statement of the rule in Lawton v. Steele[] is still valid today....").
The Washington Supreme Court has repeatedly followed Lawton. See State v. Brown, 37 Wash. 97, 101, 79 P. 635 (1905) (following Lawton this court struck down a state law requiring dental offices to be owned by dentists on the ground such law was not necessary to further any valid state objective), overruled in part by State v. Boren, 36 Wash.2d 522, 219 P.2d 566, (1950); City of Seattle v. Proctor, 183 Wash. 293, 298, 48 P.2d 238 (1935) ("in order to sustain legislative interference with the business of the citizen, the court must be able to see that the act tends in some degree to promote the public health, morals, safety, or welfare. In every case the means adopted must be reasonably necessary to accomplish that purpose, and should not be unduly oppressive upon the citizen. The determination of the Legislature as to these matters is not conclusive, but is subject to the supervision of the courts, and, if the above prerequisites are wanting, a law imposing unreasonable restrictions on a lawful occupation will be held void."); Cougar Business Owners Ass'n v. State, 97 Wash.2d 466, 477, 647 P.2d 481 (1982) ("The classic statement of the rule in Lawton v. Steele[], is still valid today ...."), cert. denied, 459 U.S. 971, 103 S.Ct. 301, 74 L.Ed.2d 283 (1982); Orion Corp. v. State, 109 Wash.2d 621, 646-47, 747 P.2d 1062 (1987) ("Under the classic, 3-pronged, substantive due process test of reasonableness, a police power action must be reasonably necessary to serve a legitimate state interest."), cert. denied, 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988); Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 829 P.2d 765 ($219,000 fee levied against an individual landowner violates substantive due process), cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); Guimont v. Clarke, 121 Wash.2d 586, 609, 854 P.2d 1 (1993) (law requiring landowner to pay $7,500 in relocation assistance for each tenant violates substantive due process under Lawton test), cert. denied, 510 U.S. 1176, 114 S.Ct. 1216, 127 L.Ed.2d 563 (1994); Rivett v. City of Tacoma, 123 Wash.2d 573, 870 P.2d 299 (1994) (Tacoma ordinance requiring indemnification for sidewalk injuries from abutting landowners violates substantive due process); Robinson v. City of Seattle, 119 Wash.2d 34, 830 P.2d 318 (tenant relocation assistance payments unduly oppressed property owner under Lawton test), cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992).
Lawton is particularly applicable here as Seeley asserts his use of medicinal marijuana to treat the symptoms of chemotherapy greatly benefits him while at the same time is "harmless in [itself]" and "might be carried on without detriment to the public interests." Lawton, 152 U.S. at 138, 14 S.Ct. at 501. Although in this jurisdiction many applications of the Lawton rule pertain to concerns associated with the ownership and use of real property, we should recall the classical formulation of such matters provides that a man's first and most fundamental property interest is in his person (James Madison, Essay on Property for the National Gazette *626 (Mar. 27, 1792), in 14 The Papers of James Madison 266-68 (Robert A. Rutland & Thomas A. Mason et al. eds., 1983)) (one's property interest extends not only to one's "land, or merchandise, or money" but also to "the safety and liberty of his person...."). And efforts to dichotomize interests of life, liberty, and property lack historical justification. See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1409 n. 11 (9th Cir.1989) ("Freedoms granted by the bill of rights were cut from a single constitutional cloth and [were] never dichotomized into personal and property.") (quoting Norman Karlin, Back to the Future: From Nollan to Lochner, 17 Sw. U.L.Rev. 627, 637-38 (1988)).
Although Planned Parenthood v. Casey, 505 U.S. 833, 876, 112 S.Ct. 2791, 2820, 120 L.Ed.2d 674 (1992) did not cite Lawton, its analysis proceeds on the same track: do the interests of the public require such interference? I find the analysis in Casey as well as its antecedent, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) wholly dispositive in Mr. Seeley's favor.
Let us recall both Roe and Casey, like the case before us, focus upon an individual's claim that the State lacks sufficient justification to dictate to a woman matters associated with her bodily integrity, abortion specifically. A majority in Roe recognized that the State "may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life." Roe, 410 U.S. at 154, 93 S.Ct. at 727. Similarly, a majority in Casey recognized these same legitimate interests, yet held "legitimate interests are not enough." Casey, 505 U.S. at 932, 112 S.Ct. at 2849 (Blackmun, J., concurring).
As a general proposition I posit if the state's interest to regulate abortion in the context of Casey and Roe is insufficient, the State's asserted interest to criminalize Mr. Seeley's ingestion of marijuana to case the effects of nausea is even less so.
Casey begins with favorable reference to the second Justice Harlan's dissent in Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1776-77, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting), which discusses the liberty referenced in the due process clause: "This `liberty' is not a series of isolated points pricked out in terms of the taking of property, the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints."[9] Thus the majority in Casey rejected the "rational relation" test upon which our majority hangs its hat. Majority at 619 n. 20. Citing numerous examples, Casey focused directly on matters "involving the most intimate and personal choices ... central to personal dignity and autonomy" which are "central to the liberty protected by the Fourteenth Amendment," 505 U.S. at 851, 112 S.Ct. at 2807, and then states:
At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.
Casey, 505 U.S. at 851, 112 S.Ct. at 2807.
Apparently the Supreme Court opines personal choices essential to personal dignity and autonomy, even when those choices are at odds with legitimate state interests, are constitutionally privileged. According to Casey, these considerations have application to abortion because natural childbirth involves "pain that only she must bear" as well as "suffering ... intimate and personal...." Casey, 505 U.S. at 852, 112 S.Ct. at 2807. The term "personal" is repeated throughout the course of the opinion, which also characterizes Roe as an example of a rule "of personal autonomy and bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection." Casey, 505 U.S. at 857, 112 S.Ct. at 2810. Turning *627 aside a challenge to overrule Roe, Casey "decided that any regulation touching upon the abortion decision must survive strict scrutiny, to be sustained only if drawn in narrow terms to further a compelling state interest." Casey, 505 U.S. at 871, 112 S.Ct. at 2817.
Were we to restrict Roe and Casey to a specific narrow holding on abortion we would rob these decisions of their claimed basis in the fundamental principles inherent in substantive due process. Scholars (sometimes critically) argue the statements contained in Roe and Casey "apply to nonrights such as a person's desire to consume heroin, or not to wear a motorcycle helmet, as persuasively as they do to procreational interests." David Crump, How Do the Courts Really Discover Unenumerated Fundamental Rights? Cataloguing the Methods of Judicial Alchemy, 19 Harv. J.L. & Pub. Pol. 795, 894 n. 446 (1996).
I would apply the aforementioned analysis set forth in Lawton, Roe, and Casey to the facts at hand in the following manner.

Public v. Private Interests
First, Lawton asks whether the public interest justifies such interference with the individual. Roe and Casey clarify that the more personal the individual interest, the more that interest concerns bodily autonomy, the more that interest centers on purely personal concerns such as the avoidance of pain through a medical procedure, the less likely the governmental restraint will be upheld. The rationale behind Glucksberg is much the same. An absolute criminal bar to the use of marijuana includes specifically personal concerns of bodily autonomy coupled with the personal desire to mitigate if not alleviate needless physical suffering. These are grave interests which favor the individual.
On the other hand, the claimed interests of the State are insubstantial. There is little relation between the ingestion of marijuana by Mr. Seeley and the specter of drug abuse by others, other than the desire to make a political statement that marijuana in leaf form has no legitimate use under any conceivable circumstance.[10] But the government's argument that the ingestion of marijuana may have uncertain medical consequences seems unpersuasive when, at the *628 same time, the government concedes that it cannot dispute Mr. Seeley's testimony about how its ingestion affects him, the tragic medical fact that he is terminally ill, nor the fact that Seeley's doctor states on the record it is in Seeley's interest to use marijuana for medical reasons.
To emphasize this is the necessary constitutional result I would also find Ravin v. State, 537 P.2d 494 (Alaska 1975) persuasive. Ravin invalidated a similar Alaska statute insofar as it prohibited one from possessing and smoking marijuana in his own home. Ravin identified "unwanted governmental intrusions into one's privacy," 537 P.2d at 499, as well as the "right of personal autonomy in relation to choices affecting an individual's personal life." Id. at 500. Considering the recreational use of marijuana in one's home, a less compelling circumstance than what we have here, the court emphasized "[t]he experiences generated by use of marijuana are mental in nature ... and thus among the most personal and private experiences possible. So long as conduct does not produce detrimental results, the right of privacy protects the individual's conduct designed to affect these inner areas of the personality .... and so the statute infringed on the right of personal autonomy." Ravin, 537 P.2d at 501. The Alaska court also reflected upon the opinion of Justice T.G. Kavanagh in People v. Sinclair, 387 Mich. 91, 194 N.W.2d 878, 896 (1972) which recited "`Big brother' cannot, in the name of Public health, dictate to anyone what he can eat or drink or smoke in the Privacy of his own home." See also Suenram v. Society Valley Hosp., 155 N.J.Super. 593, 383 A.2d 143 (1977) (recognizing constitutional privacy right of informed cancer patient to take laetrile).

Necessary Means
Even assuming the interests of the public are sufficient to require such interference, Lawton further requires the means be reasonably necessary to accomplish the purpose. Lawton, 152 U.S. at 138, 14 S.Ct. at 501. But the means employed here, total and absolute prohibition, are anything but that. Under our statute marijuana in leaf form is not even available through medical prescription, unlike PCP angel dust, cocaine, opium, and morphine.[11] Our statute is an absolute prohibition against physician prescription, no matter what the learned medical judgment of our state-licensed practitioner. It forbids the physician to practice his healing arts and denies the patient benefit of professional care.[12] Such is the situation notwithstanding the opinion widely held by physicians that medicinal marijuana is safe and efficacious and should be used for a variety of ailments. See Harvard Professor Lester Grinspoon, M.D. and James B. Bakalar, Marihuana, the Forbidden Medicine (1993).
A recent study conducted amongst the members of the Washington State Medical Association found 80 percent of its doctors favored controlled availability of marijuana for medical purposes. CP at 561 (In the Matter of Marijuana Rescheduling Petition [Drug Enforcement Administration] Opinion and Recommended Ruling, Findings of Fact, Conclusions of Law and Decision of Administrative Law Judge (Sept. 6, 1988) (Young Opinion)). Another recent study found that 44 percent of oncologists surveyed had already recommended the illegal use of marijuana to at least one patient and half would prescribe it to other patients if doing so was legal. R. Doblin & M.A.R. Kleiman, Marijuana as Anti-emetic Medicine: A Survey of Oncologists' Attitudes and Experiences, Journal of Clinical Oncology 9 (1991) 1275-1280 n. 292 (cited in Grinspoon & Bakalar, supra at 39). Individuals anecdotally praise the successful use of medical marijuana for a *629 variety of ailments. California and Arizona voters recently approved physician prescription of marijuana in their states. Derrick Augustus Carter, Knight in the Duel with Death: Physician Assisted Suicide and the Medical Necessity Defense, 41 Vill. L.Rev. 663, 723 (1996). The New England Journal of Medicine, the premier authority in this country on medical developments, editorialized in January 1997 against prohibition. Dr. Jerome Kassirer, editor, 336 New England Journal of Medicine 366 (1997). After cataloging the medical benefits, the journal's editor opined government authorities are "out of step with the public" and the medical community and urged the government "to rescind their prohibition of the medical use of marijuana for seriously ill patients and allow physicians to decide which patients to treat." Id. The editorial concluded that depriving seriously ill patients medical marijuana is "inhumane." Id.
A well-known case documents how the government has approached the issue. CP 533-603 (Young Opinion, supra at 533). Pursuant to federal law the Drug Enforcement Agency must reclassify any schedule I drug if a petitioner can demonstrate an accepted medical use. In 1972 the National Organization for the Reform of Marijuana Laws (NORML) filed such a petition. Grinspoon & Bakalar, supra at 13. Three times the agency refused to process the petition and three times the federal circuit court ordered the agency to consider the petition on its merits. Fourteen years later, in 1986, the DEA finally directed its administrative law judge to hear the case. Judge Francis Young took evidence at various hearings for two years and issued a 68-page opinion in 1988. Judge Young unambiguously recommended making marijuana medically available and concluded:
The overwhelming preponderance of the evidence in this record establishes that marijuana has a currently accepted medical use in treatment in the United States for nausea and vomiting resulting from chemotherapy treatments in some cancer patients. To conclude otherwise, on this record, would be unreasonable, arbitrary and capricious.
CP at 569; Young Opinion, supra at 34.
Notwithstanding Judge Young's thoroughly documented opinion, the head of the Drug Enforcement Agency denied the petition for rescheduling, relying upon "common sense" that there is no medical use of marijuana.
I recite these facts as they are pertinent to the second prong of the Lawton test insofar as they all suggest availability of leaf marijuana by prescription as a means by which the government could accomplish some of its alleged objectives while making the substance available to those with a particular medical need; although I hasten to add availability only through prescription may not be sufficient to overcome objections raised under the first prong of the test. Compare Ravin v. State, 537 P.2d 494 (Alaska 1975) (home marijuana use for recreational as well as medical use protected).

Unduly Oppressive Upon Individuals
The third prong of Lawton requires the result not be unduly oppressive upon individuals. I find our criminal prohibition on marijuana unduly oppressive in every sense of the word. Our court has previously invalidated state and local legislative acts on precisely this ground in the context of rental housing relocation payments (Robinson v. City of Seattle), demolition fees (Sintra v. City of Seattle), and trailer park relocation fees (Guimont v. Clarke). This prong of the rule, consistently applied, would require no less in the case at bar. I doubt many individuals would require Mr. Seeley to suffer extreme nausea in lieu of the relief he could obtain from a marijuana cigarette. But it seems the government is endowed with neither the compassion nor mercy possessed by the ordinary citizen. However, insofar as the Fourteenth Amendment prohibits the State from depriving anyone of their liberty absent due process, it is the duty of the judicial branch of government to save and protect "any person," not the least of whom is Ralph Seeley, from bearing the unduly oppressive weight of government action upon his weakened shoulders.

*630 Reply to Majority's Due Process Analysis

The majority's discussion of the due process clause is confined to but a single footnote. Majority at 619-620 n. 20. Two propositions are there tendered: (1) due process is satisfied if a total prohibition of marijuana is "rationally related" to accomplishing a legitimate state interest and (2) a number of cases from other jurisdictions have held that such a prohibition is indeed "rational."

a. Rational Relationship Test Rejected
Apparently the majority opts for an extremely deferential standard whereby the law is upheld if the court can even imagine any hypothetical set of facts "presumed to exist" under which the Legislature might have constitutionally enacted the law. See State's Brief in Response to Brief of ACLU at 8. This test, however, has been inconsistently utilized by the United States Supreme Court, wherein it was abandoned in Casey, questioned in Glucksberg, obviously out of step with Lawton, and makes no sense in this case.
It is true the United States Supreme Court has sometimes applied such a two-tiered approach to due process claims. If it labels the liberty interest at stake "fundamental" it opines the State cannot regulate same absent a narrowly tailored compelling state interest. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). If, on the other hand, the individual interest were found to be less than fundamental[13] the state action will be upheld unless there is no imaginable rational basis to support it.[14]Compare, e.g., Bowers v. Hardwick, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846-47, 92 L.Ed.2d 140 (1986) (popular view that homosexuality is immoral provides sufficient rational basis for anti-sodomy laws).
But in reality simply labeling the interest has proven dispositive because strict scrutiny is virtually impossible to pass while rational basis is virtually impossible to fail. Francis S. Chlapowski, The Constitutional Protection of Informational Privacy, 71 B.U. L.Rev. 133, 145 (1991) ("[W]hen the question of whether a right is fundamental is raised, the preliminary finding of a `fundamental' interest is usually outcome-determinative."). See Russell W. Galloway, Jr., Basic Substantive Due Process Analysis, 26 U.S.F. L.Rev. 625, 645 (1992) (rational basis "is so minimal" that "[t]he outcome is a foregone conclusion.... The test involves `minimal scrutiny in theory and virtually none in fact.'") (citation omitted); see also Laurence H. Tribe, American Constitutional Law 343 (2d ed.1988) (hereinafter Tribe, American Constitutional Law) (referring to rational basis as imposing "relatively toothless limits" on the state).
This two-tiered classification system of strict scrutiny and rational basis has proven problematic and subject to criticism because it shoehorns what in reality exists on a continuum into absolute but artificial categories. Compare Casey, 505 U.S. at 848-849, 112 S.Ct. at 2805 (citing Poe, 367 U.S. at 543, 81 S.Ct. at 1776-77 which analyzes "liberty interests" upon "a rational continuum which, broadly speaking, includes a freedom from all substantive arbitrary impositions and purposeless restraints."). While the 14th Amendment simply references "liberty," the question posed by the majority is whether there is a "fundamental interest" to smoke marijuana. I disagree with this formulation because the constitution speaks of principles, not specifics. Freedom from needless suffering; the right to individual autonomy; the right to bodily integrity; the right to physician treatment and medical assistance; and freedom from arbitrary, privacy-invading restraints are the principles applicable here.
Better we should question the predicate which supposedly justifies state intervention in the first place than shift the burden to the private citizen to show why he should be freewhich is, or should be, the natural state in a free society. Compare Youngberg v. Romeo, 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982) ("Accordingly, *631 whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests."); Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 278-79, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990) (an individual's "liberty interests" must be balanced against the state's interest in regulation); Foucha v. Louisiana, 504 U.S. 71, 79-80, 112 S.Ct. 1780, 1784-86, 118 L.Ed.2d 437 (1992) (balancing an individual's liberty interest in remaining free from bodily restraint against the state's punitive interest in restraining him); and Glucksberg, ___ U.S. ___, 117 S.Ct. 2258, 2303 (1997) (concurring opinions appear to embrace balancing test and reject rational relation test). "The purpose of the Constitution and Bill of Rights, unlike more recent models promoting a welfare state, was to take government off the backs of people." Schneider v. Smith, 390 U.S. 17, 25, 88 S.Ct. 682, 687, 19 L.Ed.2d 799 (1968).[15]
Planned Parenthood v. Casey, 505 U.S. 833, 876, 112 S.Ct. 2791, 2820, 120 L.Ed.2d 674 (1992) held the balancing approach was superior to the two-tiered approach because the "liberty" protected by the Fourteenth Amendment must be viewed on a continuum which balances the citizen's need for freedom of action against the state's justification for intervention. Lawton is much the same since under the first prong of Lawton the court must determine "the interests of the public [that] ... require such interference." Lawton, 152 U.S. at 137, 14 S.Ct. at 501.
Properly viewed, under the rational continuum test, Seeley prevails because his need is personal and great, whereas the state's interest to prevent the conduct is small if not pretextual.
Even were we to adhere to the majority's two-tiered approach, I would nevertheless reject the majority's claim that Seeley's interest to inhale or ingest any substance to relieve his agony is in any degree less fundamental than any other interest judicially recognized as such.[16] Offensive, in the extreme, is the proposition that the government may restrict ingestion of a substance found by a licensed physician to be medically advisable to comfort a terminal patient. Such right is as fundamental as any. Compare, e.g., Cruzan (fundamental right to refuse life support by exercising personal control of medical treatment).
Washington v. Harold Glucksberg, ___ U.S. ___, 117 S.Ct. 2258, 2302, 138 L.Ed.2d 772 (1997) also supports this view. While Glucksberg unanimously rejected a claimed constitutional right to physician assisted suicide because of the overriding state interest to preserve human life, no single opinion represented an unqualified majority. Justice O'Connor, and several other justices comprising a majority of five, wrote separately to emphasize their concurrence was conditioned upon the existence of laws insuring that terminal patients may access pain relief. See Glucksberg, ___ U.S. at ___, 117 S.Ct. at 2303 (O'Connor, J., concurring) ("[A] patient who is suffering from a terminal illness and who is experiencing great pain has no legal barriers to obtaining medication, from qualified physicians, to alleviate that suffering, even to the point of causing unconsciousness and hastening death."). Similarly, Justice Breyer, also concurring in result, wrote, "Were the legal circumstances differentfor example, were state law to prevent the provision of palliative care, including the administration of drugs as needed to avoid pain at the end of lifethen the law's impact upon serious and otherwise unavoidable physical pain ... would be more directly at issue. And as Justice O'Connor suggests, the Court *632 might have to revisit its conclusions in these cases." Id. at ___, 117 S.Ct. at 2312 (Breyer, J., concurring). Unlike the unsuccessful physicians in Glucksberg, Seeley is incapacitated by nausea precisely because he seeks to save his own life. Yet the State, and the majority of this court, would slap from his hand exactly that which Seeley, his physician, and even the State acknowledge will improve the quality of his life to the detriment of no one. Compare Glucksberg, ___ U.S. at ___, 117 S.Ct. at 2307 (Stevens, J., concurring) ("Avoiding intolerable pain and the indignity of living one's final days incapacitated and in agony is certainly `[a]t the heart of [ ] liberty....'") (quoting Casey, 505 U.S. at 851, 112 S.Ct. at 2807).
I wonder how many minutes of Seeley's agony the Legislature and/or the majority of this court would endure before seeing the light. Words are insufficient to convey the needless suffering which the merciless State has imposed.

b. Errant Precedent
The majority cites six cases to support its claim that marijuana may be constitutionally prohibited without deprivation of due process. Most are distinguishable on their facts. None are controlling precedent for this court in any event. One is from another state; one from our Court of Appeals; one from the Supreme Court; four are from lower federal courts. Inferior federal court precedent is not binding on this court. Home Ins. Co. of New York v. Northern Pac. Ry. Co., 18 Wash.2d 798, 808, 140 P.2d 507, 147 A.L.R. 849 (1943). Nor are decisions from other states; certainly not our Court of Appeals. The Supreme Court case does not speak to the constitution.
Carnohan v. United States, 616 F.2d 1120 (9th Cir.1980) concerned laetrile, not marijuana, and was dismissed for failure to exhaust administrative remedies. But see Suenram v. Society Valley Hosp., 155 N.J.Super. 593, 383 A.2d 143 (1977) (upholding constitutional due process right of cancer patient to ingest laetrile.).
People v. Privitera, 23 Cal.3d 697, 591 P.2d 919, 153 Cal.Rptr. 431, 5 A.L.R.4th 178, cert. denied, 444 U.S. 949, 100 S.Ct. 419, 62 L.Ed.2d 318 (1979) also concerned laetrile and is nonbinding precedent from another jurisdiction.
United States v. Rutherford, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) is binding United States Supreme Court precedent, however, was decided solely on statutory, not constitutional, grounds.
NORML v. Bell, 488 F.Supp. 123 (D.D.C. 1980), a U.S. District Court case, involved different issues raised in a challenge by recreational marijuana smokers, not a terminal cancer patient. United States v. Fry, 787 F.2d 903 (4th Cir.), cert. denied, 479 U.S. 861, 107 S.Ct. 209, 93 L.Ed.2d 139 (1986) also involved issues distinctly different from those raised by Seeley. State v. Dickamore, 22 Wash.App. 851, 592 P.2d 681 (1979) is (1) an inferior Court of Appeals case not binding on the Supreme Court and (2) factually distinct in that it involved only marijuana for recreational use.
To the extent the majority finds support in these cases, I conclude they are inconsistent with the constitutional guarantee at issue, erroneous, and ignoble repetitions of error. Supreme Court cases cited in this dissent control the result and favor Seeley. Ravin is also persuasive.

Conclusion
For the reasons stated I would hold the law in question, which absolutely prohibits the sale, use, and/or ingestion of marijuana, deprives Mr. Seeley of his liberty absent that minimum process constitutionally due, and would therefore invalidate the statute and affirm the trial court on that basis. Accordingly, I dissent.
NOTES
[1] In 1994, Mr. Seeley's physician, Dr. Ernest Conrad, certified that Mr. Seeley qualifies to participate in the research program. The board of pharmacy did not allow him to be a part of the program because at the time no funding existed.
[2] The Controlled Substances Research Act was not amended in 1996. A bill (SB 6744) was introduced that would have expanded the scope of research permitted under the Legislature's 1979 enactment of the Research Act; however, that bill died in committee. The appropriation of money to the program does not change the substantive law. See Flanders v. Morris, 88 Wash.2d 183, 558 P.2d 769 (1977).
[3] The drug known as Marinol is dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a United States Food and Drug Administration approved drug product. RCW 69.50.206(f)(1). Marinol (dronabinol) is on Schedule II under federal law as well. 21 C.F.R. § 1308.12(f)(1) (1996).
[4] RCW 69.50.201 provides in relevant part:

(a) The state board of pharmacy shall enforce this chapter and may add substances to or delete or reschedule all substances [enumerated] .... [i]n making a determination regarding a substance, the board shall consider the following:
(i) the actual or relative potential for abuse;
(ii) the scientific evidence of its pharmacological effect, if known;
(iii) the state of current scientific knowledge regarding the substance;
(iv) the history and current pattern of abuse;
(v) the scope, duration and significance of abuse;
(vi) the risk to the public health;
(vii) the potential of the substance to produce psychic of physiological dependence liability; and
(viii) whether the substance is an immediate precursor of a controlled substance.
[5] Under the parallel federal administration process, the Drug Enforcement Administration (DEA) performs similar functions.
[6] Washington modeled its privileges and immunities clause after Oregon's privileges and immunities clause, art. I, § 20, which provides: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." The Oregon Supreme Court in State v. Clark, 291 Or. 231, 630 P.2d 810, cert. denied, 454 U.S. 1084, 102 S.Ct. 640, 70 L.Ed.2d 619 (1981), analyzed the privileges and immunities clause by asking four questions: was the challenged state action properly performed under lawful authority; does the action implicate a "privilege" or "immunity"; does the action allegedly discriminate against an individual or a class; and if so, is the discrimination permissible? See also David Schuman, The Right to "Equal Privileges and Immunities": A State's Version of "Equal Protection," 13 Vt. L.Rev. 221, 229 (1988). An "equal privileges and immunities" clause appears in the constitutions of fifteen states. Schuman, supra at 223. Oregon is the only state which has given an independent analysis under its state privileges and immunities clause. Id. at 225-26.
[7] The majority in State v. Smith, 117 Wash.2d 263, 281, 814 P.2d 652 (1991), found that art. I, § 12 of the Washington Constitution and the Equal Protection Clause of the Federal Constitution were substantially similar and declined to interpret art. I, § 12 independently of the Fourteenth Amendment. Justice Utter concurred in the result, finding, however, that a separate analysis was warranted under the state constitution after an analysis of the factors in Gunwall. Id. at 284-87, 814 P.2d 652. He proceeded to adopt the analysis of the Oregon Supreme Court in Clark. Id. at 287-291, 814 P.2d 652.
[8] The Supreme Court in Vacco v. Quill, ___ U.S. ___, 117 S.Ct. 2293, ___ L.Ed.2d ___ (1997), found that New York's law prohibiting physicians assisted suicide was rationally related to legitimate state objectives and, thus, did not violate equal protection.
[9] Like its state counterpart, a substance will be classified in Schedule I under the federal scheme if the substance has (1) a high potential for abuse, (2) no currently accepted medical use in treatment in the United States, and (3)no accepted safety for use in treatment under medical supervision. 21 U.S.C. § 812(b)(1) (1981).
[10] The DEA's final administrative order set forth criteria for evaluating the validity of scientific research and evaluated the scientific evidence presented by both side against these criteria. Certain scientific practices have been generally accepted by the scientific community which are designed to increase the validity of experimental studies. Studies or research projects which do not follow these accepted scientific practices have very limited, if any, credibility. A review of such studies must first examine the degree to which researchers control, or hold constant, the variables which could affect the results, accept the variable being studied. The second factor is the placebo effect, which is the tendency of research subjects to act and respond in a manner they believe is expected of them. To eliminate this factor, research subjects are usually "blinded," or not informed of what drugs they are receiving. Results of non-blinded studies are questionable since they could be attributable, in large part, to psychological reactions rather than any real affects from the experimental drug. The next factor which must be minimized or eliminated for a research study to be valid is the exception of the researcher.

In addition to the factors related to the design and execution of a research study, there are two other factors which must be reviewed in evaluation of a research study. Research results are always considered tentative or preliminary until they have been replicated or confirmed by another researcher. The research study must be reported in sufficient detail to permit others to repeat it. Finally, publication of a study in a scientific journal, especially a journal which subjects an article to review prior to publication, adds validity to a study. Journal publications subject a study to review and scrutiny by the scientific community and open the door to replication of the studies. Unpublished studies are inherently suspect. 54 Fed.Reg. 53767-78 (1989).
[11] The Controlled Therapeutic Research Act placed marijuana in schedule II only for purposes of the research program.
[12] See United States v. Burton, 894 F.2d 188 (6th Cir.), cert. denied, 498 U.S. 857, 111 S.Ct. 157, 112 L.Ed.2d 123 (1990); National Organization For the Reform of Marijuana Laws v. Bell, 488 F.Supp. 123 (D.D.C.1980); United States v. Astling, 733 F.2d 1446 (11th Cir.1984); United States v. Fogarty, 692 F.2d 542 (8th Cir.1982), cert. denied, 460 U.S. 1040, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983); United States v. Gramlich, 551 F.2d 1359 (5th Cir.), cert. denied, 434 U.S. 866, 98 S.Ct. 201, 54 L.Ed.2d 141 (1977); United States v. Spann, 515 F.2d 579 (10th Cir.1975); United States v. Kiffer, 477 F.2d 349 (2d Cir.), cert. denied, 414 U.S. 831, 94 S.Ct. 165, 38 L.Ed.2d 65 (1973); United States v. Rodriquez-Camacho, 468 F.2d 1220 (9th Cir.1972), cert. denied, 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973); State v. McManus, 718 S.W.2d 130 (Mo.1986); State v. Price, 495 So.2d 389 (La.App. 1986), writ denied, 499 So.2d 84 (La.1987); State v. Olson, 127 Wis.2d 412, 380 N.W.2d 375 (App. 1985), review denied, 128 Wis.2d 566, 386 N.W.2d 500 (1986); State v. Hanson, 364 N.W.2d 786 (Minn.1985); State v. Stallman, 673 S.W.2d 857 (Mo.App.1984); State v. Kelly, 106 Idaho 268, 678 P.2d 60, cert. denied, 469 U.S. 918, 105 S.Ct. 296, 83 L.Ed.2d 231 (1984); State v. Ennis, 334 N.W.2d 827 (N.D.), cert. denied, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983); Isbell v. State, 428 So.2d 215 (Ala.Crim.App.1983); People v. Schmidt, 86 Mich.App. 574, 272 N.W.2d 732 (1978).
[13] Dr. Brookoff explains that drugs used in chemotherapy cause nausea by stimulating an area of the brain called the chemoreceptor trigger zone. He states that the most successful group of anti-nausea drugs have been the recently introduced medications which block serotonin receptors in the chemoreceptor trigger zone.
[14] This report is published in 3 Proceedings of the American Society of Clinical Oncology, 91 (1984).
[15] See Clerk's Papers (CP) at 492-493 (Sharon Sutton et. al., Possible Risk of Invasive Pulmonary Aspergilliosis With Marijuana Use During Chemotherapy For Small Cell Lung Cancer, 20 Drug Intelligence and Clinical Pharmacy (Apr. 1986)).
[16] Dr. Lapey included articles to support her opinions concerning the effects of marijuana smoking on the pulmonary system. See CP 483-491 (Duane L. Sherrill et al., Respiratory Effects of Non-Tobacco Cigarettes: A Longitudinal Study in General Population, 20 International Journal of Epidemiology, 132-137 (1991); Suzanne E.G. Fligiel et al., Marijuana Exposure and Pulmonary Alterations in Primates, 40 Pharmacology, Biochemistry and Behavior, at 637-642 (1991))
[17] Dr. Brookoff stated that he, along with other physicians, participated in treatment trials using inhaled marijuana in the late seventies and early eighties because, at the time, there was no better alternative.
[18] Dr. Brookoff's opinions were reiterated by Kelly Martin, an oncology pharmacist specialist at St. Joseph Medical Center in Tacoma.
[19] Other federal courts have considered and rejected the argument that marijuana's classification is irrational in relation to other substances. United States v. Greene, 892 F.2d 453 (6th Cir. 1989), cert. denied, 495 U.S. 935, 110 S.Ct. 2179, 109 L.Ed.2d 508 (1990); United States v. Fry, 787 F.2d 903 (4th Cir.1986), cert. denied, 479 U.S. 861, 107 S.Ct. 209, 93 L.Ed.2d 139 (1986); United States v. Maiden, 355 F.Supp. 743 (D.C.Conn. 1973); United States v. Fogarty, 692 F.2d 542 (8th Cir.1982), cert. denied, 460 U.S. 1040, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983); United States v. Middleton, 690 F.2d 820, 823 (11th Cir.1982), cert. denied, 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983); United States v. Kiffer, 477 F.2d 349 (2d Cir.), cert. denied, 414 U.S. 831, 94 S.Ct. 165, 38 L.Ed.2d 65 (1973).
[20] The American Civil Liberties Union, in an amicus brief before this Court, argues that marijuana's classification violates due process. The parties, however, have not raised this issue in their briefs and the issue was not considered by the trial court. This Court has recognized that it need not address issues raised solely by an amicus or issues not raised at the trial court unless it is necessary to reach a proper decision. See Harris v. Dep't of Labor & Indus., 120 Wash.2d 461, 469-70, 843 P.2d 1056 (1993). In this case, an analysis under the due process clause will not change the result. Under both an equal protection and a due process challenge the analysis and the result are the same. See Bell, 488 F.Supp. at 134 n. 29 (citing Buckley v. Valeo, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976)) (the due process clause of the Fifth Amendment requires that legislation satisfy the same standards of equal protection of the law that are guaranteed by the Fourteenth Amendment). Courts which have heard due process challenges have applied a rational basis test and have repeatedly found that a person does not have a due process right to access an unapproved medicine free from government control and have upheld the rationality of marijuana's classification. See Carnohan v. United States, 616 F.2d 1120 (9th Cir. 1980) (constitutional right of privacy and personal liberty do not give an individual the right to obtain medicine free from the lawful exercise of government police power); People v. Privitera, 23 Cal.3d 697, 591 P.2d 919, 925-26, 153 Cal.Rptr. 431, 5 A.L.R.4th 178, (1979) (due process right to privacy is not violated where statute proscribing the distribution of a drug to be used in the alleviation or cure of cancer bore a rational relationship to the achievement of a legitimate state interest in the health and safety of its citizens); United States v. Rutherford 442 U.S. 544, 547, 99 S.Ct. 2470, 2473, 61 L.Ed.2d 68 (1979) (due process right to privacy is not violated because a patient's selection of a particular treatment is within the area of governmental interest in protecting public health); see also Bell, 488 F.Supp. at 134 (marijuana's classification withstood due process challenge); Fry, 787 F.2d 903 (marijuana's classification did not violate due process); State v. Dickamore, 22 Wash.App. 851, 854-55, 592 P.2d 681 (1979) (marijuana's classification did not violate due process). Additionally, a case relied upon heavily by amicus, Compassion in Dying v. Washington, 79 F.3d 790 (9th Cir.1996), which held that a terminally ill individual has a fundamental right to hasten one's death through physician assisted suicide, was recently overruled by the United States Supreme Court. Washington v. Glucksberg, ___ U.S. ___, 117 S.Ct. 2258, ___ L.Ed.2d ___ (1997). In overruling the Ninth Circuit's decision, the Court emphasized that it has "`always been reluctant to expand the concept of substantive due process' "and that it will do so only when necessary to protect those "fundamental rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition' ... such that `neither liberty nor justice would exist if they were sacrificed.'" Id. at ___, 117 S.Ct. at 2268 (citations omitted); see also San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 30, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973) (courts must look to the Constitution, not the "importance" of the asserted right, when deciding whether an asserted right is "fundamental"). In the face of this recent Supreme Court decision, finding that a terminally ill person does not have a fundamental right to physician assisted suicide, it appears that a terminally ill patient would not then have a constitutionally protected right to receive a particular medical treatment over the rational objections of the state.
[21] ILL. CONST. art. II § 23; MASS. CONST. pt. 1, art. 18; N.H. CONST. pt. 1, art. 38; N.C. CONST. art. I, § 35; OHIO CONST. art. VIII, § 18 (repealed 1851); VA. CONST. art. I, § 15; VT. CONST. ch. I, art. 18; W VA. CONST art. III, § 20; WIS. CONST. art. 1, § 22. In 1889 South Dakota adopted a similar provision. S.D. CONST. art. VI, § 27. Since 1889, Arizona and Utah have adopted provisions almost identical to Washington's fundamental principles provision. ARIZ. CONST. art. 2, § 1; UTAH CONST. art. 1, § 27.
[22] Massachusetts' and New Hampshire's fundamental principles provisions both call for "a frequent recurrence to the fundamental principles of the constitution." MASS. CONST. pt. 1, art. 18; N.H. CONST. pt. 1, art. 38.
[1] Joseph Sobran, The Wanderer 5 (June 26, 1997).
[2] The Washington privileges and immunities clause provides:

No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.
Wash. Const. art. I, § 12.
[3] The federal equal protection clause provides:

No State shall ... deny to any person within its jurisdiction the equal protection of the laws.
U.S. Const. amend. 14, § 1.
[4] The ACLU brief asserts the Washington statute prohibiting access to medical marijuana in leaf form violates the substantive due process clause of the Fourteenth Amendment to the United States Constitution. Amicus Brief of the American Civil Liberties Union of Washington Foundation (ACLU Amicus Brief) at 9. This court has the authority to entertain the ACLU's arguments. City of Tacoma v. Luvene, 118 Wash.2d 826, 832-33, 827 P.2d 1374 (1992) (deciding preemption issue briefed only by amicus); Harris v. Department of Labor & Indus., 120 Wash.2d 461, 467-68, 843 P.2d 1056 (1993) (the appellate court has inherent authority to address issue raised only by amicus if necessary to reach a proper decision). Here, the issue has been fully briefed by both sides. See State of Washington's Answer to ACLU Amicus Brief.
[5] Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting) (quoting Hurtado v. California, 110 U.S. 516, 532, 4 S.Ct. 111, 119, 28 L.Ed. 232 (1884)).
[6] Seeley's doctor, Dr. Ernest Conrad III, Director of Musculoskeletal Oncology at the University of Washington, states on the record, "In short, if I could prescribe marijuana for him [Seeley], I would." Clerk's Papers (CP) at 82.
[7] The record is replete with uncontroverted evidence that Seeley and many similarly situated cancer patients undergo unbearable pain and digestive unrest as a result of chemotherapy and radiation treatments and that they claim leaf marijuana is one of the only efficacious agents available to case their suffering.
[8] Casey, 505 U.S. at 894, 112 S.Ct. at 2829 ("Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." (Citation omitted.)).
[9] Compare Glucksberg, ___ U.S. at ___ __ ___, 117 S.Ct. at 2275-93 (Souter, J., concurring) where Justice Souter exhaustively reviews the legal history of substantive due process through the present day, concluding the Harlan dissent represents the appropriate analysis.
[10] Historically, marijuana has been used in a variety of ways. The original Declaration of Independence (July 4, 1776) was written on hemp as was Thomas Paine's Common Sense. Jack Herer, The Emperor Wears No Clothes 7 (1995). George Washington and Thomas Jefferson grew it, and Benjamin Franklin used it in an early papermill. Marty Bergoffen & Roger Lee Clark, Hemp as an Alternative to Wood Fiber in Oregon, 11 J. Envtl. L. & Litig. 119, 120 (1996).

Throughout the nineteenth century marijuana was used as an anticonvulsant, as an analgesic and in the treatment of rheumatism, epilepsy and tetanus. Lester Grinspoon, M.D., and James B. Bakalar, Marihuana, the Forbidden Medicine 5-6 (1993) (included in part in CP at 92-119). Marijuana was administered to Queen Victoria by her court physician. Id. at 4. In nineteenth century America marijuana was listed in the United States Dispensatory (1854), was generally available in drug stores, and was characterized in an early medical study as "a drug that has a special value in some morbid conditions and the intrinsic merit and safety of which entitles it to a place once held in therapeutics." Dr. J.B. Mattison, Cannabis indica as an Anodyne and Hypnotic, St. Louis Medical Surgical Journal 61, 266 (1891), quoted in Grinspoon & Bakalar, supra at 6.
However, marijuana was repressed by the federal government in 1937 through a stamp tax so burdensome both financially and procedurally that it virtually eliminated any legal medicinal, industrial or recreational use of marijuana. 26 U.S.C. § 4741, repealed by Comprehensive Drug Abuse Prevention and Control Act of 1970, tit. III, § 1101(b)(3)(A), 84 Stat. 1292. The purpose of the tax was prohibition although it was effectuated in the form of a revenue measure because of constitutional limits still enforced against federal lawmaking power. Grinspoon & Bakalar, supra at 8. The elimination of marijuana came from pressures exerted by newly created "Federal drug control agencies, cotton and timber interests, and chemical industries." Bergoffen & Clark, supra at 122 n. 20. Marijuana was removed from the United States Pharmacopoeia and National Formulary in 1941.
Shortly after the Marijuana Tax Act was held unconstitutional in 1969, in a failed attempt to prosecute Dr. Timothy Leary for possession of untaxed marijuana (Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (marijuana tax unconstitutional as violative of the Fifth Amendment's guarantee against self-incrimination)), Congress passed the Controlled Substances Act, placing marijuana in schedule I and directly criminalizing any use of it. Washington followed suit in 1971 and adopted an identical regime also placing marijuana in schedule I. Laws of 1971, 1st Ex.Sess., ch. 308 at 1794 (Uniform Controlled Substances Act).
[11] Under Washington law, use of leaf marijuana is illegal for any purpose. RCW 69.50.204(d)(13). Doctors may never prescribe it no matter how efficacious it may be in a given case. In contrast, Washington law allows doctors to prescribe cocaine, PCP angel dust, opium, and morphine. RCW 69.50.206.
[12] Compare Glucksberg, ___ U.S. at ___, 117 S.Ct. at 2273 ("[P]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer." (Citation omitted.)); (Souter, J., concurring) at *38-40 (Physician's care is within American tradition and is given "high value." Dying patient who seeks help is subject to few state-imposed restraints.); Casey, 505 U.S. at 857-58, 895-97, 112 S.Ct. at 2810, 2830 (upholding the affirmative due process right to obtain medical intervention).
[13] There is an intermediate standard not relevant here, used primarily in the equal protection context. See, e.g., Griffin v. Eller, 130 Wash.2d 58, 65, 922 P.2d 788 (1996); State v. Heiskell, 129 Wash.2d 113, 123, 916 P.2d 366 (1996).
[14] I must confess, even under this standard of virtual judicial abdication, I can still find no rational basis for this statute.
[15] Compare Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 162, 93 S.Ct. 2080, 2109, 36 L.Ed.2d 772 (1973) (Douglas, J., concurring) ("The struggle for liberty has been a struggle against Government. The essential scheme of our Constitution and Bill of Rights was to take Government off the backs of people.").
[16] Such recognized "fundamental" liberty interests are catalogued in Washington v. Harold Glucksberg, ___ U.S. ___, ___ __ ___, 117 S.Ct. 2258, 2280-82, 138 L.Ed.2d 772 (1997) (Souter, J., concurring). Subjects include segregation in education, interracial marriage, marital privacy and contraception, abortion, "personal control of medical treatment" (citing Cruzan ) and physical confinement. Justice Souter criticizes what is our majority's approach as "absolutist" rather than weighing application of competing principles.